1  DONALD SPECTER (SBN 83925)
   KELLY KNAPP (SBN 252013)
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California 94710
   Telephone: (510) 280-2704
4  Fax: (510) 280-2704

5  MAUREEN P. ALGER (SBN 208522)
   COOLEY LLP
6  Five Palo Alto Square
   3000 El Camino Real
7  Palo Alto, CA 94306-2155
   Telephone: (650) 843-5000

8
   ATTORNEYS FOR PLAINTIFFS
9
   **[ADDITIONAL COUNSEL LISTED ON NEXT PAGE]**
10

11              UNITED STATES DISTRICT COURT

12         FOR THE EASTERN DISTRICT OF CALIFORNIA

13  QUENTIN HALL, SHAWN GONZALES,          Case No. 1:11-CV-02047-LJO-BAM
    SHARON CHAVEZ, ROBERT MERRYMAN,
14  DAWN SINGH, CARLTON FIELDS, and        **CLASS ACTION**
    BRIAN MURPHY on behalf of themselves and all
15  others similarly situated,             **FIRST AMENDED CLASS ACTION
                                           COMPLAINT FOR INJUNCTIVE
16              Plaintiffs,                AND DECLARATORY RELIEF**

17         v.

18  MARGARET MIMS, Sheriff, Fresno County;
    EDWARD MORENO, M.D., Director, Fresno
19  County Department of Public Health; GEORGE
    LAIRD, Ph.D., Division Manager, Division of
20  Correctional Health, Fresno County Department of
    Public Health; PRATAP NARAYEN, M.D.,
21  Medical Director, Division of Correctional Health,
    Fresno County Public Health; RICK HILL, Captain of Detention, Fresno County
22  Sheriff's Office; MARILYNN WELDON, Captain
    of Inmate Programs and Contracts, Fresno County
23  Sheriff's Office,

24              Defendants.

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1             MARY KATHRYN KELLY (SBN 170259)
                        COOLEY LLP
2             4401 Eastgate Mall
                        San Diego, CA 92121-1909
3             Telephone: (858) 490-6000

4             MELINDA BIRD (SBN 102236)
                        RACHEL SCHERER (SBN 260538)
5             ANDREW BERK (SBN 248386)
                        DISABILITY RIGHTS CALIFORNIA
6             3580 Wilshire Blvd., Ste. 902
                        Los Angeles, CA 90010
7             Telephone: (213) 427-8747

8             **[ADDITIONAL COUNSEL LISTED ON CAPTION PAGE]**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**NATURE OF THE ACTION**

1.     This civil rights class action lawsuit seeks declaratory and injunctive relief to remedy dangerous and unconstitutional conditions in the Fresno County Adult Detention Facilities ("Jail").  Plaintiffs, who are seven prisoners in the Jail, bring this action on behalf of themselves and all other prisoners (pretrial and convicted detainees) in the Jail, because they have been and continue to be seriously injured as a result of Fresno County officials' systemic failure to 1) provide minimally adequate health care, including medical, mental health, and dental care; 2) protect prisoners from injury and violence from other prisoners; and 3) provide reasonable accommodations to prisoners with disabilities.  This failure to provide adequate care, safety, and reasonable accommodations in the Jail has caused widespread harm, including severe and unnecessary pain and injury, and violates prisoners' rights under the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act.

2.     Defendant Sheriff Margaret Mims is ultimately responsible for the health care and safety of prisoners in the Jail, but she has failed to meet this responsibility.  Sheriff Mims and the other Defendants have been deliberately indifferent to the substantial risk of harm caused by policies and practices that result in an ineffective health care screening process, an ineffective health care request and referral system, delayed access to health care, under-qualified and insufficient numbers of health care staff, and the delivery of substandard health care.   One consequence of such policies and practices is that prisoners with serious mental health conditions are housed in dungeon-like conditions of extreme sensory deprivation where correctional officers attempt to control their untreated mental symptoms with force.  Another consequence is that prisoners with serious and chronic medical conditions have suffered from life-threatening symptoms that could have been avoided if they had received timely and adequate medical care.

3.     Sheriff Mims and the other Defendants have also been deliberately indifferent to the level of violence among prisoners that is caused, at least in part, by exceedingly low staff-to-prisoner ratios, inadequate classification procedures, and dangerous jail construction design flaws. As a result of this deliberate indifference, prisoners are frequently harmed by assaults or fights

1

with other prisoners in the Jail.

**4.**     Defendants do not have adequate policies and procedures that enable them to identify, assess, or reasonably accommodate prisoners with disabilities so they can participate in and access the activities, programs, and services that they are otherwise qualified for.  Thus, prisoners with disabilities suffer from pervasive discrimination in the conditions of their confinement.  Plaintiffs therefore seek an injunction compelling Defendants to provide reasonable accommodations to prisoners with disabilities.

**5.**     Finally, because Defendants know that prisoners live under conditions creating a substantial risk of harm but have not responded reasonably to this dire situation, Plaintiffs seek an injunction compelling Defendants to immediately provide them and the class members they represent with constitutionally adequate care and protection from violence and assault from other prisoners.

<b>JURISDICTION</b>

**6.**     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections 1331, 1343, and 1367.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. Sections 1343, 2201, and 2202; 42 U.S.C. Section 1983; 42 U.S.C. Section 12101 et seq.; and 29 U.S.C. Section 794.

<b>VENUE</b>

**7.**     Venue is proper in the Eastern District of California under 28 U.S.C. Section 1391(b) because Plaintiffs' claims for relief arose in this district, and one or more of the defendants reside in the district.

<b>PARTIES</b>

**8.**     Plaintiff Quentin Hall is a prisoner in the Fresno County Jail.  Mr. Hall has suffered from hallucinations, delusions, manic and depressive episodes, and severe anxiety as a result of Defendants' failure to provide him with minimally adequate mental health care.  After five months of not receiving medically necessary anti-psychotic medications, Mr. Hall was found incompetent to stand trial and sent to Atascadero State Hospital (ASH).  Upon his return to the Jail three months later, the ASH discharge summary notified Defendants that he suffered from

2
<b>FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF</b>

Schizoaffective Disorder and he needs an anti-psychotic medication to adequately treat his symptoms.  Defendants discontinued his anti-psychotic medication within the first 24 hours of his arrival, and they continue to refuse to provide this medically necessary psychotropic medication.  As a result, Mr. Hall is suffering from recurring psychosis, depression, anxiety, and insomnia.  He has submitted several written requests and grievances for mental health treatment to no avail.  Mr. Hall has exhausted his administrative remedies.

9.      Plaintiff Shawn Gonzales is a prisoner in the Fresno County Jail.  Mr. Gonzales suffers from severe anxiety, depression, and suicidal thoughts as a result of Defendants' failure to provide him with minimally adequate mental health care.  Beginning in July 2011, Mr. Gonzales told Defendants at least three times that he was suicidal.  On November 9, 2011, he told Defendants he was going to kill himself and that he had been banging his head on the wall of the cell.  That same day, Defendants erroneously determined he was not a danger to himself and returned him to his cell where he was not directly observed by correctional officers or mental health providers.  Within a few hours, Mr. Gonzales hung himself with a bed sheet, but was rescued by his cellmate, who initiated CPR.  Mr. Gonzales has subsequently submitted at least five written requests and a grievance requesting mental health treatment for anxiety, depression, and suicidal thoughts, but Defendants continue to fail to provide him with adequate mental health treatment.

10.     Plaintiff Sharon Chavez is a prisoner in the Fresno County Jail.  She suffers from severe anxiety, depression, suicidal thoughts, and manic episodes as a result of Defendants' failure to provide her with minimally adequate mental health care.  Ms. Chavez was restrained in a restraint chair for several hours in November 2011 and January 2012 due to disruptive behaviors associated with her untreated mental health symptoms.  Defendants placed her in the restraint chair without first attempting to control her behaviors with less extreme measures, and without consulting with mental health providers.  Defendants also failed to properly evaluate her for any medical or psychiatric complications during or after the restraint chair placements.  Due to Defendants' failure to adequately treat her symptoms, and their policy and practice of using the restraint chair as an automatic response to the types of behaviors she exhibits related to her

mental health condition, Ms. Chavez continues to be at risk for future restraint chair placements.

11.     Plaintiff Robert Merryman was a prisoner in the Fresno County Jail from March 12, 2011 until December 28, 2011. Mr. Merryman suffers from serious and chronic diseases including Chronic Obstructive Pulmonary Disease (COPD), and hypertension. Mr. Merryman described his untreated symptoms in several written requests for medical care and grievances. Medical specialists hired by Defendants notified Defendants that Mr. Merryman requires medical care. Nonetheless, Defendants failed to provide him with even minimally adequate medical care, including, but not limited to, timely access to qualified medical professionals, medically necessary diagnostic testing, medically necessary specialty care, and essential medications. Mr. Merryman was also attacked and injured by another prisoner as a result of Defendants' pattern and practice of understaffing correctional officers and failing to provide adequate supervision. Mr. Merryman has exhausted his administrative remedies.

12.     Plaintiff Dawn Singh is a prisoner in the Fresno County Jail. Prior to her incarceration, Ms. Singh was diagnosed with Crohn's disease. Since her incarceration, Ms. Singh has suffered from excruciating medical symptoms for two years as a result of Defendants' failure to adequately treat her Crohn's Disease. These symptoms include hemorrhaging, abdominal pain and cramping, diarrhea, fevers, dehydration and fatigue. Ms. Singh has written dozens of requests for health care and filed grievances describing these symptoms. Medical specialists hired by Defendants have also notified Defendants that Ms. Singh requires medical care. Regardless, Defendants have failed and continue to fail to provide her with timely access to qualified professionals, medically necessary diagnostic testing, and medically necessary specialty and follow-up care. Defendants have also failed to provide her with adequate dental care. Ms. Singh has exhausted her administrative remedies.

13.     Plaintiff Carlton Fields is a prisoner in the Fresno County Jail. Mr. Fields suffered from a severely painful, swollen, and infected tooth for at least two weeks as a result of Defendants' failure to provide him with adequate dental care. During that two-week period, he made several written requests for dental care, spoke with several correctional officers, and submitted a grievance describing his symptoms. Although he belatedly received dental care for

4

his infection, he is still suffering from painful and bleeding gums, and he is at risk of serious and irreversible tooth decay as a result of Defendants' failure to provide him with adequate dental care and dental hygiene tools.  Defendants have also failed to prescribe the anti-psychotic medication he needs to adequately treat his auditory hallucinations, paranoia, and insomnia.  Mr. Fields has exhausted his administrative remedies.

**14.**     Plaintiff Brian Murphy is a prisoner in the Fresno County Jail.  Mr. Murphy severely injured his knees and back while serving in the United States Marine Corps, and was honorably discharged due to his now permanent disability.  He requires the use of a cane to alleviate pain and prevent falls when he walks.  He has difficulty standing for long periods of time, walking long distances, and navigating stairs.  Defendants have refused to provide him with a cane despite his grievance requesting this accommodation.  Defendants have also housed him on the second tier of his housing unit in the North Jail despite his written request and grievance requesting to be housed on a lower tier.  He must therefore slowly, unstably, and painfully hobble up and down the stairs to receive his medications, attend court, visit with an attorney or his family, use the shower, go to the yard or gym, socialize in the dayroom, or participate in other basic daily life activities.  He has already fallen once going up the stairs in his housing unit.   Mr. Murphy avoids leaving his cell unless absolutely necessary, even if it means skipping meals and showers, because it is too painful and dangerous.  In addition, Defendants refuse to provide Mr. Murphy with adequate pain medication to treat the chronic and debilitating pain he experiences in his knees and back.  Mr. Murphy has exhausted his administrative remedies.

**15.**     Defendant Sheriff Margaret Mims is the Sheriff of the County of Fresno.  She is sued in her official capacity.  In her capacity as Sheriff, she is ultimately responsible for the safekeeping of all prisoners in the Jail.  These responsibilities include, but are not limited to, the operation and administration of all of the Jail facilities.  Sheriff Mims has contracted with the Fresno County Department of Public Health to provide all health care services in the Jail, but by statute retains the ultimate county authority over the health care and treatment of the plaintiff class.

**16.**     Defendant Edward Moreno is the Director of the Department of Public Health.  He

is sued in his official capacity. He is responsible for the provision of health care services, including medical, dental, and mental health care, to all prisoners in the Jail. His responsibilities include, but are not limited to, approving all policies and procedures for the delivery of health care in the Jail.

17. Defendant George Laird is the Division Manager of the Division of Correctional Health in the Fresno County Department of Public Health. He is sued in his official capacity. He is responsible for supervising the operation and administration of health care services in the Jail.

18. Defendant Pratap Narayen is the Medical Director of the Division of Correctional Health in the Fresno County Department of Public Health. He is sued in his official capacity. He is responsible for the delivery of health care services to all prisoners in the Jail.

19. Defendant Rick Hill is the Captain of Detention in the Jail. He is sued in his official capacity. His responsibilities include, but are not limited to, custody operations, prisoner classification, correctional officer training, security emergency response, and prisoner grievances.

20. Defendant Marilynn Weldon is the Captain of Inmate Programs and Contracts. She is sued in her official capacity. Her responsibilities include, but are not limited to, the oversight of the contract with the Department of Public Health for the delivery of health care in the Jail.

## CLASS ACTION ALLEGATIONS

21. Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all adult men and women ("prisoners") who are now, or will be in the future, incarcerated in the Fresno County Jail. All prisoners are at risk of substantial harm due to the following policies and practices:

        **(a)** Denial of minimally adequate medical care,

        **(b)** Denial of minimally adequate mental health care,

        **(c)** Denial of minimally adequate dental care, and

        **(d)** Denial of protection from injury and violence from other prisoners.

Prisoners with disabilities also face the additional risk of disability discrimination due to Defendants' policy and practice of failing to provide reasonable accommodations.

22.     The class is so numerous that joinder of all members is impracticable.  There are currently more than 2,300 prisoners in the Jail, and the population is expected to grow to more than 2,700 prisoners in April 2012 due to AB 109, which is a legislative measure designed to reduce the state prison population by housing more prisoners in county jails ("realignment").  All prisoners are at risk of developing serious medical, dental, or mental health conditions while in the Jail, and while the exact number is unknown, plaintiffs believe there are hundreds of prisoners at any given time who already have serious medical, dental, and/or mental health conditions.   All prisoners in the Jail are at risk of injury and violence from other prisoners.  Finally, although the exact number is unknown, plaintiffs believe there are scores of prisoners with disabilities who are unable to receive reasonable accommodations.

23.     There are questions of law and fact common to the class including 1) whether the failure to provide minimally adequate medical, dental, and mental health care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution; 2) whether the failure to protect prisoners from injury and violence from other prisoners violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution; and 3) whether the failure to reasonably accommodate prisoners with disabilities violates the ADA and Section 504 of the Rehabilitation Act.

24.     Since the number of class members is more than 2,300, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the defendants.

25.     Defendants have acted on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

26.     The claims of the Named Plaintiffs are typical of the claims of the class and subclass, and the Named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class.

**FACTUAL ALLEGATIONS**

27.     Sheriff Mims is ultimately responsible for the care and safety of the approximately

7

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

2,300 prisoners in the Jail.  In her role as Sheriff, she supervises a team of seven managerial staff that includes Captain Hill and Captain Weldon.   Captain Hill is responsible for the correctional operations of the Jail.  Captain Weldon oversees the contract with the Department of Public Health for the delivery of health care in the Jail.  In this role, she works directly with Edward Moreno, George Laird, and Pratap Narayan, who are the Department of Public Health administrators responsible for the delivery of health care at the Jail.  All of these parties are intimately familiar with the policies and practices described herein that create a substantial risk of harm to prisoners at the Jail.

**28.**    Sheriff Mims, in her role as supervisor and executive administrator of the Jail, has knowledge of the policies and practices described herein that create a substantial risk of harm to prisoners caused by inadequate health care and violence from other prisoners, but she has disregarded this risk.  Plaintiffs' counsel notified Sheriff Mims of the substantial risk of harm described in this complaint in a 12-page letter dated October 4, 2011.  Sheriff Mims initially responded by requesting a delay of two months to the end of November to investigate these issues.  As of this date, Sherriff Mims has not provided any substantive response to the issues raised in the letter, and Defendants have failed to take reasonable measures to abate the substantial risk of harm.

## I.    HEALTH CARE

**29.**    Prisoners are entirely dependent on Defendants for basic health care, but Defendants are failing in their constitutional obligation to provide such care.   The medical, dental, and mental health care ("health care") provided by Defendants in the Jail is woefully inadequate and subjects prisoners to a substantial risk of serious injury or death.   Defendants have a policy and practice of failing to employ qualified health care professionals, to properly or conscientiously train and supervise the conduct of such persons after their employment, and to provide timely access to minimally adequate care.   Defendants' conduct demonstrates deliberate indifference and a reckless disregard for prisoners' Eighth and Fourteenth Amendment rights.

1  **A.      Defendants Maintain Insufficient Health Care Staffing to Provide Adequate**

2  **Health Care to Prisoners.**

3       **30.**      Defendants have a policy and practice of maintaining fewer health care positions

4  than are necessary to adequately treat the number of prisoners in the jail.  There are insufficient

5  medical, dental, and mental health clinicians (i.e., physicians, psychiatrists, psychologists,

6  therapists, social workers, and registered nurses) to provide adequate care to over 2,300 prisoners.

7  This is a major contributing factor in the woefully inadequate health care delivery system in the

8  Jail.  For example, there are not enough staff to timely respond to prisoners' requests for health

9  care, or to adequately screen, monitor, and provide follow-up care to prisoners who are suffering

10  from serious and chronic illnesses.  This problem is exacerbated between the hours of 11 p.m. and

11  7 a.m. when the most prisoners are booked into the Jail and the only medical providers serving

12  2,300 prisoners located in three different buildings (North Jail, South Annex Jail, and Main Jail)

13  are four nurses.

14       **31.**      The Jail has not always been so severely understaffed.  Over the last few years, in

15  response to Fresno County budget cuts, Defendants have systematically eliminated staffing

16  positions for health care providers in the Jail, including physicians, nurse practitioners, registered

17  nurses, and psychiatric technicians.  They have eliminated these positions in the face of dire

18  warnings from health care providers during budget hearing testimony that prisoner-patients would

19  suffer serious harm or death from delayed access to care, delayed response time to emergencies,

20  poor medication management practices, and entry-level providers practicing outside the scope of

21  their licensure.  Defendants ignored these warnings, and prisoner-patients are now suffering from

22  inadequate health care as a result of their deliberate indifference.

23       **32.**      As a result of these staffing shortages, Licensed Vocational Nurses (LVNs) and

24  Psychiatric Technicians (LPTs) make sole determinations about whether prisoners should be seen

25  by clinicians in response to requests or referrals for health care.  But, according to the California

26  Board of Vocational Nurses and Psychiatric Technicians, LVNs and LPTs are entry level health

27  care providers who must only practice under the direct supervision of physicians, psychologists,

28  registered nurses, social workers, or other qualified professionals, and are not qualified to do their

9

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

own patient evaluations or assessments.  Nonetheless, the LVNs and LPTs are tasked with independently assessing and responding to prisoners' health care requests and correctional officers' referrals for health care, and therefore serve as de facto gatekeepers for further treatment.

33.    For example, Defendants rely upon these entry-level providers to act as gatekeepers for mental health treatment.  In many instances, LVNs and LPTs erroneously determine that prisoners with documented histories of mental illness and serious ongoing mental health conditions do not warrant treatment by mental health clinicians.  These same low-level employees also make unsupervised decisions about whether and where mentally ill prisoners who are potentially a danger to themselves or others should be housed in the Jail, decisions that can have serious or even life-threatening consequences.

34.    On July 20 and August 10, 2011, Plaintiff Shawn Gonzales stated he was suicidal. In response, even though they were not qualified to do so, LPTs evaluated Mr. Gonzales. Without conferring with a qualified mental health professional, the LPTs determined both times that Mr. Gonzales was not suicidal.  Also without supervision, the LPTs determined both times that Mr. Gonzales was safely housed in his current housing unit and refused to refer Mr. Gonzales to a clinician for mental health treatment.  Three months later, Mr. Gonzales hung himself in his cell.  Since that time LPTs have twice more determined that Mr. Gonzales is not suicidal and refused to refer him to a mental health clinician.

**B.    The Screening and Intake Process for Serious Illnesses, Mental Health Conditions, and Communicable Diseases Is Inadequate.**

35.    Defendants have a policy and practice of failing to adequately identify and treat the health care problems of newly arriving prisoners during the screening and intake process.  As prisoners are booked into the Jail, they are placed in an open holding cell with other prisoners.  A nurse, sitting on the other side of a glass window, asks the prisoners a series of questions about any medical symptoms or treatment.  In front of other prisoners, the newly arriving prisoners must divulge personal and private information about their health loudly enough so that the nurse can hear them through the window.  Not only is this process humiliating and demeaning, it is

dangerous because many prisoners reasonably do not want other prisoners to know about their private health care, especially their mental health histories, and therefore fail to divulge all of the information needed to house them safely and provide adequate health care.

36.     Defendants have a policy and practice of failing to identify prisoners with communicable diseases and serious illnesses during the screening and intake process.   For example, medical staff do not adequately screen for tuberculosis.  Although tuberculosis is highly contagious and potentially deadly, prisoners do not receive testing for this disease until several weeks or even sometimes several months after they arrive, if they are ever tested at all.  Plaintiffs Shawn Gonzales and Sharon Chavez, for example, have not been tested for tuberculosis.

37.     Defendants have a policy and practice of failing to adequately identify prisoners who are experiencing mental health symptoms and who are at risk of suicide during the screening and intake process.

**C.     The Process for Prisoners to Request Health Care Is Inadequate.**

38.     Defendants have a policy and practice of failing to provide a reliable way for prisoners to alert health care staff of their need for evaluation of medical, mental health, or dental problems.  To request health care, prisoners are instructed to use the Medical Request for Services form, which is a green form commonly called a "green slip."  If prisoners tell health care providers who happen to be in their housing units about their symptoms, they are told to "fill out a green slip."  After filling out green slips, prisoners must give them to correctional officers, who do not always forward those completed green slips to the appropriate health care providers.  In some instances, correctional officers refuse to give prisoners green slips to fill out when prisoners request them, or they mock prisoners for their symptoms, whether written on a green slip or told to them directly.

39.     When and if health care providers receive green slips from prisoners, they often do not provide a timely response.  For example, Plaintiff Dawn Singh never received a response to seven green slips she submitted from September through December 2009 complaining of rectal bleeding, abdominal cramping, and frequent bowel movements.  In June 2011, health care providers failed to evaluate another prisoner in response to her green slips describing symptoms

11

1  related to uncontrolled high blood pressure, including blurred vision, arm pain, and heart

2  palpitations.

3       **40.**    The failure to timely respond to green slips is caused, at least in part, by

4  Defendants' failure to create an effective tracking and scheduling system for health care

5  appointments. Another contributing factor is there are no standardized protocols dictating when

6  prisoners should receive a face-to-face appointment with a nurse or other medical, dental, or

7  mental health care clinician. Consequently, health care providers arbitrarily determine whether

8  the content of a green slip, often written by a prisoner who can barely read or write, warrants an

9  examination.

10      **41.**    In some instances, medical staff members respond to green slips solely in writing.

11  For example, in response to green slips from one prisoner dated January 3 and 6, 2011, describing

12  headaches and dizziness after a head injury, the sole response from medical staff was a written

13  note telling him to buy Motrin and Tylenol from the canteen. In another example, medical staff

14  failed to respond to a prisoner's green slips describing alarming and serious high blood pressure

15  symptoms, and instead admonished her in a written response to take medications she had already

16  explained were not helping and may have been worsening her symptoms.

17  **D.**    **Prisoners Suffer from Unreasonably Delayed Access to Health Care.**

18      **42.**    Defendants have a policy and practice of failing to provide timely access to health

19  care. If prisoners are seen by health care providers at all, they often experience substantial delays

20  in receiving those appointments. Prisoners commonly wait several weeks, sometimes several

21  months, before they are evaluated by clinicians for medical, mental health, or dental symptoms.

22  For example, one prisoner waited at least six months before he was evaluated by a physician in

23  response to at least nine green slips and a grievance describing debilitating migraines. While he

24  waited, he spent days at a time curled up in a fetal position on his bed with his head under the

25  blankets trying to manage the pain. Another prisoner is still waiting to be evaluated by a

26  physician in response to green slips requesting asthma and seizure medications that he submitted

27  over five months ago. In fact, since he arrived in April 2011, he has never been examined by a

28  health care provider even though Jail medical staff verified four months after admission that he

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

has been provided seizure and psychiatric medications by the state prison system.

**43.**   Plaintiff Carlton Fields waited two weeks in agony from an infected and swollen tooth before he was seen by a dentist. Mr. Fields began seeking dental care for a severe toothache shortly after his arrival in August 2011. In his first two weeks at the Jail, he submitted several green slips. He begged several correctional officers to help him receive care. He went cell by cell asking other prisoners if they had any pain medications to spare. He approached a nurse in his pod and showed her his tooth. Despite all of these efforts, Defendants failed to respond to Mr. Field's pleas for treatment. Out of sheer desperation after days of blinding pain, he told a correctional officer that he was experiencing chest pain in an attempt to be seen in the medical clinic for treatment of his tooth. He was seen by a nurse, but was not provided with dental care. In another act of desperation, he told a correctional officer that he was in so much pain he would hurt someone if not provided with dental care. In response, he was placed in a "safety cell," which is a stark, rubber-walled cell with nothing but a hole in the floor to use as a toilet. After several hours and more begging for dental care, he was finally taken out of the safety cell to the dental clinic where he was diagnosed with an acute infection. But even then, his tooth was not pulled until twelve days later, a total of at least four weeks after he began submitting green slips and asking for care.

**E.    Even When Prisoners See Health Care Providers, They Do Not Receive Adequate Care.**

**Substandard Medical Care**

**44.**   None of the Jail's physicians are board certified in any areas of medical specialization. Board certification is obtained through a rigorous process of testing and peer evaluation. Board certification is important in a jail setting because prisoners tend to have higher levels of illness than the general population, and the range and acuity of those illnesses is particularly complex. Even though physicians in the Jail have not gone through this certification process, they are called upon to diagnose and treat prisoners with serious and chronic diseases such as HIV, diabetes, cirrhosis, and seizure disorders. The standard of care in the profession requires these types of conditions to be referred to a board certified specialist in internal

medicine, but Defendants do not consistently follow that standard of care.

45.     Defendants have a policy and practice of making treatment decisions without examining prisoners.  In some instances, they rely solely on brief notes or reports from nurses or medical assistants.  For example, instead of examining Plaintiff Merryman after a nurse documented that he was complaining of chest and abdominal pain, his physician simply ordered a refill of his pain medications and an EKG.  Due to Mr. Merryman's co-existing and serious medical conditions, the minimum standard of care would have been for the physician to examine him to ensure that the abdominal pain he experienced was not the result of an infection.

46.     In other instances, physicians make treatment decisions even though there is no recent medical information whatsoever in a prisoner's medical records.  For example, Plaintiff Merryman's physician prescribed a certain medication on May 23, 2011 without taking or checking any laboratory tests, which is contrary to the standard practice when prescribing such medication and put him at risk of conditions including cardiac arrhythmia.  In some instances, physicians prescribe medication based solely on correctional officers' description of prisoners' symptoms.  For example, a physician increased a prisoner's blood pressure medications on January 26, 2011, based solely on a correctional officer's report that his legs were swollen.

47.     Defendants have a policy and practice of failing to provide complete examinations, including after significant illnesses have been identified and/or documented.  For example, even though Plaintiff Singh consistently complained of abdominal cramping, weight loss, watery stools, and had a documented history of small bowel surgery, she did not receive a rectal examination, which is the standard of care, for at least a year and a half after she began requesting treatment.  Also, although her physician did not complete a rectal examination or consult with a gastrointestinal specialist, he prescribed a dangerous and aggressive course of steroid treatment on October 18, 2010.  Once Ms. Singh was finally seen by a specialist almost four months after she was belatedly referred by the Jail physician, the medication regimen was immediately discontinued.

48.     Defendants have a policy and practice of failing to order diagnostic testing or refer prisoners to specialists when medically necessary.  For example, after a prisoner injured his head

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

in a fall on or around January 1, 2011, his physician failed to test for infection until his wound was emitting a foul odor one month after the injury, even though it was showing signs of infection for over two weeks.  This prisoner has a compromised immune system due to cirrhosis, and his physician should have known that he was at high risk of infection.  After the delayed test came back positive for a staph infection, the physician failed to refer him to a specialist to determine the extent of the infection.  His physician failed to make this referral even though the infection was potentially life-threatening due to his compromised immune system and the infection's proximity to his brain.

49.   Plaintiff Dawn Singh was not referred to a specialist for her Crohn's disease for over a year even though she had ongoing symptoms of severe abdominal pain, diarrhea, dehydration, and fatigue.  After she was referred on September 16, 2011, Jail medical staff failed to follow-through and contact the specialist to schedule an appointment.  The Jail physician did not discover this failure until two months later in November 2011 when he evaluated Ms. Singh for bloody diarrhea, a common symptom of a Crohn's Disease flare-up, and re-referred her to the specialist.  Ms. Singh was forced to wait almost two more months until she was finally seen by the specialist on January 6, 2011.

50.   Another prisoner told the screening nurse upon her arrival in May, 2011 that she had a history of kidney failure.  Contrary to the standard of care, Defendants failed to obtain her community records or perform laboratory tests to determine the severity of her kidney disease. Defendants failed to evaluate her in response to her repeated green slips describing blurred vision, headaches, swelling in her extremities, difficulty urinating, nausea, vomiting, and high blood pressure.  Also contrary to the standard of care, Defendants failed to order urgent diagnostic tests in response to these symptoms to determine whether her kidneys were functioning properly. Blood tests were finally taken for the first time three months after her arrival on July 29, 2011. These tests showed that she was at risk of death from kidney failure and a dangerously high potassium level, but a physician did not review her blood test results until seven days later on August 4, 2011, at which time she was hospitalized.  She remained hospitalized until August 12, 2011, and put on dialysis three times a week.  If Defendants had provided treatment according to

1  the standard of care, her worsening kidney failure would have been caught months earlier,

2  certainly delaying, if not averting the need for dialysis.

3      **51.**    If physicians prescribe treatment, or when prisoners return from the hospital, or

4  when they are discharged from the Jail infirmary, Defendants have a policy and practice of failing

5  to monitor symptoms and provide follow-up treatment.  For example, Plaintiff Dawn Singh

6  received a colonoscopy on July 20, 2011.  Although her colonoscopy results were not normal, and

7  her specialist subsequently recommended additional diagnostic tests to rule out fungal infections

8  and tuberculosis, the Jail physician failed to order this follow-up care, and she was not re-

9  evaluated by a physician until her next specialty appointment two months later.  The specialist

10  again ordered the same diagnostic tests because they are necessary before she can begin receiving

11  treatment for her active Crohn's Disease.

12     **52.**    Plaintiff Bob Merryman was hospitalized for three days in July 2011, where he

13  was diagnosed with moderate to severely high blood pressure in his lungs, cirrhosis, and large

14  swollen blood vessels in his esophagus.   The discharge summary recommended follow-up

15  appointments with a gastrointestinal (GI) specialist and pulmonary specialist in one week.  Mr.

16  Merryman was not seen by the GI specialist until five months later on December 1, 2011, and he

17  was not seen by the pulmonary specialist before he was released from the Jail over five months

18  after the referral was made.

19     **53.**    Defendants have a policy and practice of failing to prescribe medically necessary

20  medications, including for serious and chronic diseases such as Chronic Obstructive Pulmonary

21  Disease (COPD), hypertension, asthma, seizure disorders, and cirrhosis.  Physicians fail to

22  prescribe these medications even after prisoners and their families have notified medical staff of

23  valid prescriptions written prior to the prisoner's arrival at the Jail, either in the community before

24  incarceration, in the state prison system, or during previous incarcerations in the Jail.  Prisoners

25  are often labeled as "drug-seeking" even when they are requesting medications that have no street

26  value or intoxication effects.

27     **54.**    For example, Plaintiff Robert Merryman's physician labeled him as "drug-

28  seeking," even though he had not fully evaluated him for his complaints and the medications Mr.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Merryman sought were to treat his COPD, cirrhosis, and high blood pressure.  His physician inexplicably delayed for two months prescribing medications to control the swelling in his legs, which is a clear departure from the standard of care.  Another prisoner did not receive his cirrhosis medications until he was hospitalized for internal bleeding and vomiting on March 26, 2011, despite the fact that Defendants were notified of a pre-existing prescription for cirrhosis medications over two months earlier, on January 13, 2011.

**Substandard Mental Health Care**

55.     Defendants have a policy and practice of failing to provide medically necessary psychotropic medications to prisoners with serious mental health conditions.  They fail to provide these medications even when provided with valid prescriptions from the California Department of Mental Health, community providers, family members, or the California Department of Corrections and Rehabilitation (CDCR).

56.     Prisoners with serious mental health conditions who have long and documented histories of receiving anti-psychotic or mood-stabilizing medications are often labeled as "drug-seeking" or "malingering" by mental health staff when they seek these medications in the Jail.  In some instances, they are prescribed medications which are known not to be effective in treating their psychosis or mood disorders.

57.     As a result of Defendants' pattern and practice of failing to provide medically necessary psychotropic medications, prisoners with psychotic and mood disorders suffer from the following:  1) withdrawal symptoms when the medications they were prescribed before admission to the Jail are abruptly terminated; 2) recurrence of debilitating symptoms such as hallucinations and suicidality; and 3) in some cases, decompensation to the point of being found incompetent to stand trial and/or being sent to the State Hospital until they are stable enough to return to the Jail.

58.     For example, after five months in the Jail, Plaintiff Quentin Hall was sent to Atascadero State Hospital (ASH) to receive mental health treatment after two court-appointed psychologists found him to be incompetent to stand trial due to untreated mental health symptoms.   While at ASH, Plaintiff Quentin Hall was diagnosed as suffering from Schizoaffective Disorder.  They also worked with him to find the right anti-psychotic medication

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

to effectively manage both the mood and psychotic symptoms he experienced and that are commonly associated with this diagnosis. Despite these efforts, the Jail psychiatrist discontinued this medication within 24 hours of Mr. Hall's discharge from ASH to the Jail.

59. The Jail psychiatrist claimed he discontinued Mr. Hall's anti-psychotic medication at least in part because he believed that the treatment providers at ASH had not ruled out that Mr. Hall was faking his symptoms. The psychiatrist made this determination even though the ASH mental health providers had observed and evaluated Mr. Hall far more extensively than any treatment providers had ever done in the Jail. He also made this determination in the face of two independent findings from court-appointed psychologists that Mr. Hall was too mentally ill to understand his criminal proceedings and/or to assist his attorneys with his defense. After discontinuing the anti-psychotic medication that had proven effective in treating Mr. Hall's rapidly alternating manic and depressive moods, persecutory delusions, and auditory hallucinations, the Jail psychiatrist prescribed him the same class of anti-depressant medications that had led to his decompensation in the Jail before he was sent to ASH.

60. Defendants have a policy and practice of failing to evaluate prisoners before making treatment decisions, including whether to prescribe psychotropic medications. For example, in May 2011, a prisoner's psychiatrist prescribed an anti-depressant based solely on an LVN's note stating that the prisoner wished to start an anti-depressant and a mood stabilizer. Also, Plaintiff Hall's psychiatrist has repeatedly increased and decreased his anti-depressants without evaluating him.

61. Defendants also have a policy and practice of failing to monitor and provide follow-up treatment, even after they have prescribed anti-depressant medications. For example, contrary to the standard of care which requires a follow-up appointment within 30 days, Plaintiff Hall's psychiatrist waited three months to evaluate him again even though the anti-depressant he prescribed creates a risk of dangerous side effects such as seizures and hypoglycemia. In fact, after a Jail psychiatrist prescribes an anti-depressant, it is common practice for psychiatrists to rely solely on nurses' and LPTs' treatment notes, as opposed to personally evaluating prisoners, to monitor for side effects, effectiveness, and/or to determine whether medications should be

1   adjusted, renewed, or discontinued.  This practice is dangerous because nurses and LPTs are not

2   qualified to adequately identify, assess, and diagnosis complications, side effects, or symptoms

3   that may be caused by anti-depressant medications.

4   **Substandard Dental Care**

5   **62.**   Defendants have a policy and practice of failing to provide medically necessary

6   dental services.  As a general rule (with only very limited exceptions), the only dental service

7   available in the Jail is tooth extraction, even if a much less invasive procedure may be medically

8   appropriate and necessary.  Most prisoners are not even permitted to see a dentist until after they

9   tell a dental assistant they are willing to have a tooth extraction.

10  **63.**   Prisoners are therefore faced with a horrible dilemma–they can either lose a tooth

11  that might otherwise be saved, or suffer unbearable pain and discomfort.  Some prisoners deal

12  with this dilemma by initially refusing to have minor conditions such as cavities treated with

13  extractions, but then eventually acquiescing after they suffer from long periods of time without

14  treatment.   In some instances, after prisoners refuse to have minor conditions treated with

15  extractions, their conditions worsen until extractions become the only treatment option available.

16  Many prisoners are so terrified of having their teeth pulled that they refuse to seek any dental

17  services and instead suffer in pain, which puts them at risk of serious complications and

18  additional health risks from infection.

19  **64.**   For example, Plaintiff Dawn Singh began suffering from a toothache in early

20  2011.   Ms. Singh was aware of Defendants' policy and practice of only providing tooth

21  extractions, and avoided seeking dental care for at least nine months because she did not want to

22  have her tooth pulled for what she hoped was only a minor condition.  Finally, when the pain

23  progressed to an intolerable level, Ms. Singh turned in a green slip requesting dental care in

24  September 2011.  The dentist diagnosed her with an infection and tooth decay, and informed her

25  that her only treatment options were to wait until she was released from Jail to receive a root

26  canal or have the tooth extracted in Jail.  He also informed her that she was at risk of further

27  complications if she did not receive treatment for her tooth.  Ms. Singh believed she had no

28  choice but to have the tooth extracted because she does not expect to be released from custody for

19

1    at least another year.

2        **65.**    The failure to provide medically necessary dental care is aggravated by

3    Defendants' pattern and practice of failing to provide adequate tools to prisoners to clean their

4    teeth.  For those prisoners who are incarcerated for long periods of time, it is inevitable that their

5    teeth deteriorate given the inadequate dental hygiene tools and lack of dental care provided.

6    **F.    Defendants Fail to Keep Complete and Adequate Health Care Records.**

7        **66.**    Defendants have a policy and practice of failing to maintain adequate, accurate,

8    and complete health care records.  For example, physicians and psychiatrists often change

9    prisoners' medications without documenting any explanations.  Psychiatrists fail to document

10   adequate justification and reasoning for changing the diagnoses and treatment plans for prisoners

11   returning to the Jail from psychiatric hospitals.  For example, Plaintiff Hall's psychiatrist did not

12   adequately document why he discontinued the anti-psychotic medication that had proven

13   effective in the State Hospital and prescribed an anti-depressant that had already proven

14   ineffective both in the State Hospital and the Jail. Dental providers fail to keep x-ray results in

15   prisoners' health care files, including in Plaintiff Singh's and Plaintiff Fields's files.  Defendants

16   also fail to maintain prisoners' written requests for health care ("green slips") in their health care

17   files.   For example, Plaintiff Singh's health care file is missing dozens of green slips she

18   submitted about symptoms related to her Crohn's Disease, and Plaintiff Fields's health care file is

19   missing several green slips he submitted about his infected tooth.  As a result of Defendants'

20   failure to maintain adequate health care records, prisoners suffer from a substantial risk of

21   misdiagnosis, dangerous mistakes, and unnecessary delays in care.

22   **G.    Defendants' Failure to Provide Minimally Adequate Health Care Directly Causes**

23   **Other Unconstitutionally Harmful Policies and Practices.**

24       **67.**    Defendants' policy and practice of denying minimally adequate health care gives

25   rise to other policies and practices that result in significant harm and injury to prisoners, in

26   violation of their Constitutional rights.

27        **Solitary Confinement for Prisoners with Serious Mental Health Conditions**

28       **68.**    As a result of Defendants' policy and practice of denying medically necessary

20

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

psychotropic medications, many prisoners with serious mental conditions are unable to conform to Jail rules or be safely housed in cells with other prisoners.  In response, rather than provide them with the medications they need, Defendants have a policy and practice of housing these prisoners in isolation in the FF units of the Main Jail and Unit 2D of the South Annex Jail.  Prisoners in these maximum security housing units experience conditions of extreme isolation and reduced environmental stimulation.  Defendants are deliberately indifferent to how these conditions exacerbate mental health symptoms.

69.   In Unit 2D of the South Annex Jail, prisoners with serious mental health conditions are housed by themselves in small cells at least 23 hours a day.  There is no natural light in the cells, and they do not have clocks.  Thus, prisoners lose track of time and often have no idea whether it is day or night, or how much time has passed.  The inability to keep track of time exacerbates these prisoners' already existing mental health symptoms.

70.   The only type of human contact the prisoners on Unit 2D have on most days is when they are given their food through a slot in the door, or when they hear other prisoners (who may be psychotic, incoherent, and distressed themselves) yelling from their cells.  They are not touched by another human being unless they are being shackled.  The single window they have to the corridor outside is covered so no one can see in or out of the cells.  The conditions in Unit 2D are so bleak that staff and prisoners commonly refer to it as "the dungeon."  Several prisoners with serious mental health conditions have been housed in these conditions for lengthy periods of time, such as six months to one year.  These conditions are traumatic for all prisoners, but especially for those who are already suffering from mental health symptoms.

71.   Many of the prisoners with serious mental health conditions are placed in isolation in Unit 2D and the FF pods as punishment for an inability to follow Jail rules.  But many of these prisoners would not have violated Jail rules had they been receiving adequate mental health treatment, especially psychiatric medications.  For example, one prisoner requested mental health treatment and anti-psychotic medications to help control his psychotic symptoms and impulses for several weeks in July and August of 2010 without any response.  On September 3, 2011, he could no longer control his impulses, and he threw his food tray and responded violently to

21

correctional officers' attempts to restrain him.  He was subsequently moved to Unit 2D where he has been housed ever since.

**72.**    Defendants exacerbate the psychological trauma experienced by prisoners with serious mental health conditions who are housed in isolation by failing to provide them with necessary mental health care.  These prisoners do not receive regular contact with mental health providers (if they receive mental health care at all), nor do they receive the group therapy that is periodically provided to prisoners in other housing locations.  As a result, their nonconforming behaviors escalate and they are forced to stay in isolation even longer with very little prospect of release to the general population.

<u>**Force Used on Prisoners with Serious Mental Health Conditions**</u>

**73.**    As a result of Defendants' policy and practice of failing to prescribe medically necessary psychotropic medications, some prisoners with serious mental conditions exhibit nonconforming and erratic behaviors that correctional officers attempt to control with force. They use force without regard to the traumatic impact of such measures, and without first attempting clinical intervention.

**74.**    Correctional officers fire nonlethal bullets at close range at prisoners who are obviously in psychiatric distress.  They aim their nonlethal rifles and weapons at prisoners with mental health conditions even when it is not necessary and results in psychological trauma.

**75.**    Defendants have a policy and practice of placing prisoners with serious mental health conditions in "restraint chairs" as punishment instead of as a last resort to prevent self-harm or harm to others.  Restraint chairs are chairs on wheels with belts and cuffs that prevent prisoners' legs, arms, and torso from moving.  Strapping a prisoner into a restraint chair is an extreme measure that should only be used when a supervisor exercises his or her professional judgment to determine that no other measure will prevent harm to the prisoner or others.   In contrast, Defendants commonly use this device as an automatic response to punish difficult and non-violent prisoner behaviors such as loudness, disruptiveness, or non-compliance, although these behaviors often could have been prevented had Defendants provided adequate mental health care.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

76.   Defendants commonly restrain prisoners with serious mental health conditions in restraint chairs for at least four hours while denying them any opportunity to use a toilet or stretch their limbs.  Jail medical providers often fail to properly monitor and evaluate prisoners while in the restraint chair, even though they are at risk of developing life-threatening blood clots or other serious physical injuries due to being held immobile for such long periods of time.  Despite their serious mental health conditions, Jail mental health providers also fail to properly monitor and evaluate prisoners for psychiatric complications before, during, or after restraint chair placements.

77.   For example, Plaintiff Sharon Chavez was restrained in a restraint chair on November 17, 2011, and January 8, 2012.  Before she was placed in the restraint chair on both occasions, Ms. Chavez was being loud and disruptive in her cell as a result of her untreated mental health symptoms, but she was not a danger to herself or others.  On both occasions, Defendants failed to try less extreme measures before placing her in the restraint chair.  They also failed to consult with mental health providers about whether this was an appropriate response given her mental health symptoms.  Ms. Chavez was held immobile in the restraint chair for several hours each time, which aggravated her already fragile mental state.

78.   On November 17, 2011, Ms. Chavez was not evaluated by medical or mental health providers during the restraint chair placement, and she was only evaluated by an LPT after she was removed.  On January 8, 2012, medical providers failed to take her vital signs while she was in the restraint chair, which is contrary to the standard of care.  Ms. Chavez was not evaluated by any mental health providers during or after the January 8, 2012, restraint chair placement even though she was suffering from aggravated mental health symptoms.

**Inadequate Suicide Precautions**

79.   Defendants have a policy and practice of housing prisoners with serious mental health conditions in unsafe conditions that heighten their risk of suicide in the Jail.  For example, they house suicidal prisoners in isolation without providing adequate supervision or observation. A report from the U.S. Department of Justice warned Defendants in 2006 that the bars around each cell in the South Annex Jail provide easy noose tie-off points for prisoners to attempt suicide by hanging.  But despite this warning, dozens of prisoners with serious mental health conditions

23

are intentionally segregated in certain housing units in the South Annex Jail.  And also despite this warning, these prisoners are given coffee pots with long electrical cords that can easily be tied to the bars for suicide attempts.

80.    One prisoner who was not receiving medically necessary psychotropic medications cut his arm with a razor in May, 2011.  Just before he cut his arm, correctional officers in his unit notified Jail mental health providers that he was making suicidal comments.  A Licensed Psychiatric Technician, who is not licensed or qualified to diagnose or treat prisoners, evaluated him in response and determined he was not suicidal.  He was taken to the emergency room 40 minutes later with deep, self-inflicted cuts to his arm.  From the emergency room, he was admitted directly into in a psychiatric facility for five days where he was given the psychotropic medications he required.  Upon his return from the hospital, Defendants failed to continue his psychotropic medications and did not provide follow-up treatment.  They also gave him access to another razor.

81.    About a week later, this prisoner cut his arm and leg with a razor, except this time the cuts were so deep he required 19 staples in his wounds to help them heal.  He was hospitalized again, this time for four days, where he received medically necessary psychotropic medications.  Upon his second return to the jail, Defendants again failed to continue his psychotropic medications and housed him in isolation for four weeks.  After he was removed from isolation, he was housed in the South Annex Jail where he had access to razors and tools to hang himself on the bars.  He has finally been prescribed a psychotropic medication in the Jail, although it is a different medication than he had been prescribed at the psychiatric facility and has proved ineffective in treating his symptoms.   He then cut his arm with a razor and had to be emergently hospitalized for the third time in November, 2011.

82.    Due to the construction design of the South Annex Jail and the inadequate custody staffing patterns discussed in detail in Section II below, it is nearly impossible for custody staff to witness a suicide attempt unless they happen to be walking down the line at the right moment.  And since there are only two officers on each floor with many custodial responsibilities supervising over 200 prisoners, the chances are slim that they will be able to prevent a suicide.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Defendants are deliberately indifferent to how the failure to provide minimally adequate health care heightens the already existing risk of suicide caused by inadequate staffing patterns and construction design flaws in the Jail.

83.     Defendants have a pattern and practice of failing to adequately identify, assess, and manage prisoners who are suicidal.  For example, Plaintiff Shawn Gonzales notified Jail staff in July and August 2011 that he was suicidal.  In response, Mr. Gonzales was evaluated each time by LPTs, who were not qualified to assess and treat him for suicidality, and who did not refer him to a clinician for evaluation and treatment.

84.     On November 9, 2011, correctional officers placed Mr. Gonzales in a safety cell because he stated he wanted to hang himself.  When a social worker evaluated Mr. Gonzales in response, he said, "If you put me back in the cell, I will be suicidal."  He also told the social worker that he had been banging his head on the walls of his cell, and the social worker documented "a straight line of scratch" on his forehead.  However, the social worker erroneously determined that he was not suicidal and returned him to his cell.

85.     Later on November 9, 2011, Mr. Gonzales hung himself with a bed sheet.  Mr. Gonzales's cellmate pushed the emergency button in their cell and untied the bed sheet.  He then began performing CPR on Mr. Gonzales.  Several minutes later, when correctional officers finally arrived, Mr. Gonzales regained consciousness.  Defendants did not hospitalize him in a psychiatric facility, and he was not evaluated by a Jail psychiatrist until over a week later on November 18, 2011.

86.     Since he attempted to kill himself, Mr. Gonzales has submitted at least five green slips and a grievance describing anxiety, depression, and suicidal thoughts.  In response, on December 7, 2011, without evaluating him, a psychiatrist prescribed an anti-depressant medication.  After starting the anti-depressant, Mr. Gonzales continued to report suicidal thoughts, submitting green slips on December 22 and 31, 2011.  He was evaluated in response to these green slips by LPTs who again determined that he was not suicidal or experiencing symptoms of mental illness.  He is currently housed in the South Annex Jail, where he has access to bed sheets and electrical cords to hang himself on the bars, and razors to cut himself.  Mr.

1  Gonzales continues to be at risk of suicide due to Defendants' failure to provide minimally

2  adequate mental health care and reasonable suicide precautions.

3  **Substandard Housing Conditions**

4  **87.**   Defendants have a pattern and practice of housing and segregating prisoners with

5  serious mental health conditions in the facility with the worst living conditions, the South Annex

6  Jail.  This facility has been deemed unfit for housing prisoners (see paragraph 97 below) and is

7  especially traumatic for prisoners with serious mental health conditions.  It is extraordinarily hot

8  with poor circulation in the summer and so frigid on cold winter days that prisoners spend most of

9  their time shivering under their blankets in bed because they are not permitted extra clothing.

10  There is very little access to natural light throughout this facility.  There are serious problems

11  with the plumbing, and the water is often shut off.  Nonetheless, Defendants have chosen to locate

12  the "psychiatric housing" on the third floor of this dilapidated facility without regard for how

13  these conditions especially traumatize prisoners with serious mental health conditions.

14  **Inadequate Pre-Release Planning**

15  **88.**   Defendants have a policy and practice of releasing prisoners with serious health

16  conditions from the Jail without providing them with any services to ensure that their health care

17  is not disrupted.  For those prisoners who are prescribed medications in the Jail, they are released

18  without either a supply or a prescription for them to fill those medications at a community

19  pharmacy.  Defendants do not schedule follow-up appointments in the community, nor are

20  prisoners provided with any referrals or information about where they may receive health care

21  services or medications.

22  **89.**   Defendants have knowledge of the substantial risk of harm caused by inadequate

23  health care in the Jail and the derivative harmful policies and practices including, but not limited

24  to, inadequate suicide precautions, and housing prisoners with serious mental conditions in

25  isolation.  Defendants have failed to take steps to prevent, or even to diminish, the harmful effects

26  of these unlawful policies and practices.

27  **II.   FAILURE TO PROTECT PRISONERS FROM VIOLENCE**

28  **90.**   Prisoners face a substantial risk of harm from violence at the hands of other

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

prisoners due to Defendants' policy and practice of understaffing the Jail and failing to adequately classify prisoners.  In all of the Jail facilities, large group fights between prisoners break out regularly and smaller fights between prisoners occur daily.  Prisoners regularly assault and victimize vulnerable prisoners.  Defendants are deliberately indifferent to the danger of assault faced by prisoners in the Jail.

91.    The Fresno County Adult Detention Facilities include three jails–the Main Jail, North Jail, and South Annex Jail.

**Main Jail**

92.    In the Main Jail, most prisoners are housed on the third through sixth floors.  The second floor houses 37 prisoners who are medically infirm.  The third through sixth floors consist of six "pods,"each containing sixteen small cells.  Each cell houses at least three prisoners.  There is a common dayroom in each of the pods.  The doors to each cell in the pods are left open for most of the day, and prisoners are free to go in and out of the dayroom and other prisoners' cells. In addition to the six pods, there are ten administrative segregation cells arranged in a linear fashion.

93.    There is one officer on each floor who sits in an upraised and enclosed viewing station.   He or she has no direct contact with prisoners.  This officer can see into all of the dayrooms, but cannot see into all of the prisoners' cells.

94.    There are only two officers on the floor ("floor officers") providing supervision to over 200 prisoners in the six pods.  These officers cannot and do not provide line of sight supervision to more than two pods at any one time, leaving a minimum of over 130 prisoners without direct supervision at any given time.  To reach prisoners in a particular pod or administrative segregation cell, the floor officers must typically go through at least two locked doors.

**North Jail**

95.    In the North Jail, prisoners are housed on the second through fifth floors.  Each floor consists of six pods of dormitories with 72 beds (triple bunks), although each pod is designed to house only 48 prisoners.  There is one officer on each floor who sits in an upraised

and enclosed viewing station.  He or she has no direct contact with prisoners.  This officer has limited visibility between and around the triple bunks and in certain corners of the dorms.  There are only four floor officers providing direct supervision to over 400 prisoners.  These officers cannot and do not provide line of sight supervision to more than four pods at any one time, leaving at least 140 prisoners without direct supervision at any given time.

**South Annex Jail**

96.    The South Annex Jail was built in 1947 and is the oldest facility in the Jail. According to a Fresno County Jail Needs Assessment and Master Plan, dated September 24, 2008, "this facility is no longer functional for the housing of inmates."  Nonetheless, there are over 200 prisoners housed on each of the upper three floors of this jail, and there are only two floor officers providing direct supervision on each floor.

97.    Each floor is broken up into separate housing units that contain cells and adjoining dayrooms.  Each cell houses four prisoners.  The doors to the cells are left open periodically during the daytime, and prisoners are free to go in and out of the dayroom when the cell doors are open.  However, when the cell doors are closed, before officers can enter a cell, they must first operate an antiquated system of door controls.

98.    The housing units in the South Annex Jail are located off long corridors.  The "control rooms" on each floor, where one officer sits and watches monitors showing limited areas of the jail, have no visibility into the housing units.  Officers must walk down the corridors to observe the prisoners in the housing units, and it is easy for prisoners to cease illegal activity before officers can see them.  Also, visibility into the cells is severely limited due to the use of steel bars to separate the cells from the dayrooms and corridors.  All of the conditions in the South Annex Jail described above make it extremely difficult for officers to prevent and quickly respond to fights or emergencies, and to transport injured or combative prisoners.

99.    In all of the facilities, besides providing general safety and security for 200-400 prisoners, the floor officers must supervise and coordinate all prisoner movement to the yard, infirmary, legal visits, and court dates.  They must shackle and escort any prisoners in administrative segregation who are removed from or brought back to their cells.  They must

provide security for nursing staff when prisoners receive their medications.  They must also provide security when meal trays, canteen items, and laundry are distributed.  These officers are unable to perform all these duties and also protect prisoners from violence.

100.    In all of the facilities, there are blind spots or places out of view of correctional officers for prisoners to hide illegal activity, including assaults.  In the Main Jail, to stay out of view, prisoners assault other prisoners in their cells.  In the North Jail, prisoners go into dark corners of the dorms, or between the triple bunks.  In the South Annex Jail, prisoners in the dayrooms wait until there no officers present in the corridors or they go into cells to fight or assault others.  They also fight or assault each other in the showers.

101.    Indeed, each day prisoners are assaulted by other prisoners, whether it stems from a large drawn-out group fight in the dayroom or the yard, or a quick and vicious assault in a hidden pocket of the Jail.  Prisoners know they can fight and engage in violent behaviors in the Jail with impunity because there are not enough correctional officers to supervise and prevent such violence.

102.    Defendants have knowledge of these conditions.  A report from the U.S. Department of Justice ("DOJ Report") warned that the construction design and crowding in the South Annex and North Jails creates a risk of harm to prisoners.  It described the risk due to visibility problems, the antiquated door control systems, and the small doorframes in the South Annex Jail.  It stated that the "obsolete 'linear type' construction" of the South Annex Jail is "very staff intensive and unsafe."  It also warned about the risk of triple bunking 72 prisoners in the North Jail dorms designed to house only 48 prisoners.  Finally, the DOJ Report also warned of a risk of harm to prisoners from the bunk beds in the North Jail that are not "correctional grade" fixtures.  Thus, prisoners can tamper with the beds to create and hide weapons.

103.    Despite the warnings in the DOJ Report, Defendants have assigned only one officer to provide direct supervision for every 100 (or more) prisoners.  This staffing pattern is woefully inadequate to keep prisoners safe.

104.    Defendants have a policy and practice of failing to adequately classify and assign prisoners to housing locations in the Jail where they will be safe from injury and violence.  Before

prisoners are assigned to certain housing locations in the Jail, they are "classified" based on a number of factors including their criminal charges, gang affiliation, race, and history of violence. These classification procedures are ineffective, however, and prisoners who are incompatible for various reasons, including rival gang memberships and/or histories of assaultive behaviors, are housed together in the Jail.   Defendants are deliberately indifferent to how their inadequate classification procedures create a substantial risk of injury from assault.

**105.**   As a result of Defendants' pattern and practice of understaffing the Jail and failing to assign prisoners to safe housing locations, Plaintiff Merryman was attacked in a dayroom of the Main Jail on June 30, 2011.  Mr. Merryman is an older man who is frail due to Defendants' failure to provide him with adequate medical care.  The prisoner who attacked Mr. Merryman was obviously experiencing acute mental health symptoms.  For two days before the attack, Mr. Merryman observed this prisoner talking to himself, randomly unplugging cords from electrical outlets, and wearing garbage bags over his mouth.  On the morning of June 30, 2011, while Mr. Merryman was watching television, this prisoner attacked Mr. Merryman from behind and sliced him two times in the face with a razor.  There were no correctional officers inside or near the pod before or during the attack.

**106.**   After Mr. Merryman was attacked, a group of prisoners began beating the prisoner who sliced his face.  Correctional officers did not arrive in the dayroom until several minutes later.  Mr. Merryman went into his cell to stop the bleeding and stay out of the way of the fighting.  Before correctional officers came to his cell, he had filled up his jumpsuit and two towels with blood.  He subsequently received sutures to treat his wounds and he now has a prominent scar on his cheek.  This injury, and the beating of the prisoner with a psychiatric disability who attacked Mr. Merryman, could have been prevented if Defendants had provided adequate supervision and classification procedures in the Jail.

## III.   DISABILITY DISCRIMINATION

**107.**   Defendants have a policy and practice of failing to reasonably accommodate prisoners with disabilities.  For example, Defendants have refused to provide Plaintiff Brian Murphy with a cane or to house him in a bottom tier cell despite his inability to walk or go up and

down stairs without falling or experiencing tremendous pain.  In his current housing assignment, he must slowly, unstably, and painfully hobble up and down the stairs to receive his medications, attend court, visit with an attorney or his family, use the shower, go to the yard or gym, socialize in the dayroom, or participate in other basic daily life activities.  He has already fallen once going up the stairs in his housing unit.  Mr. Murphy avoids leaving his cell unless absolutely necessary, even if it means skipping meals and showers, because it is too painful and dangerous.  Defendants have failed to respond to his Inmate Request Form and grievances requesting to be housed on a lower tier and provided with a cane.  Defendants have also failed to provide a prisoner, who has a hearing impairment, with the TDD machine he requested to effectively communicate by phone with his attorney and family members.

**108.**     Defendants have a policy and practice of failing to provide prisoners notice of how to request reasonable accommodations for their disabilities.   In fact, the only accommodation addressed in the Inmate Orientation Handbook is a Telecommunications Device for the Deaf (TDD) machine.  Besides this machine, there is nothing in the Handbook that advises prisoners about what accommodations or services are available for prisoners with disabilities, nor are there any instructions about how to request them.  A prisoner, who has a hearing impairment, asked at least eight correctional officers in August 2011 to help him get his hearing aids that were left at the police station he was taken to before he was booked into the Jail.  All of these officers told him they could not help him, and they failed to provide with him any instructions about how he should go about getting his hearing aids.  Consequently, this prisoner believed it was not possible for him to retrieve his hearing aids from the police station, and stopped pursuing the matter.  Also as a result of not receiving his hearing aids, he was not able to fully participate in his court hearings or religious services in the Jail.

**109.**     Defendants have a policy and practice of failing to provide prisoners with disabilities the opportunity to request accommodations and/or assistive devices.   In fact, Defendants do not provide any forms designed for this purpose.  In addition, there are no policies and procedures instructing health care or correctional officers how to respond if prisoners request these accommodations through some other means.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

110. Defendants have not designated an employee to coordinate responses to requests from prisoners with disabilities for reasonable accommodations as required by the ADA, 28 C.F.R. Section 35.107(a).   As a result, Defendants often fail to timely respond to prisoners' requests for accommodations, if they respond at all.   In the few instances when Defendants respond to requests, they fail to engage in an interactive process with those prisoners and their responses are typically arbitrary and counterproductive.   For example, when Plaintiff Brian Murphy filled out an "Inmate Request Form" on October 12, 2011, asking to be assigned to a first floor unit and a middle bunk to accommodate his mobility impairment, a correctional officer only wrote in response, "You have a low bunk restriction."   When another prisoner with a vision impairment asked a nurse in his housing unit for help receiving dental care, the nurse told him to fill out a green slip even after he explained that he could not fill out a green slip without assistance.   This prisoner had to give items he purchased from the canteen to other prisoner in exchange for filling out green slips on his behalf.

111. Defendants have failed to provide an effective grievance system for prisoners with disabilities as required by the ADA, 28 C.F.R. Section 35.107(b).   First, disability accommodations are not listed as a grievable issue in the Inmate Orientation Handbook and the Sheriff's Department Grievance Policies and Procedures.   Second, the grievance forms fail to provide prisoners with a specific section or instructions for requesting reasonable accommodations.   Third, even if prisoners use the current grievance forms to request disability accommodations, there are no policies and procedures directing health care or correctional staff how to respond.

112. As a result, prisoners who file disability related grievances do not receive responses or they are told they are receiving adequate medical care without having their disability concerns addressed or accommodated through any type of interactive process.   For example, one prisoner filed a grievance because he was not receiving gloves to use for manual evacuation of his bowels.   In the grievance response, he was told that he was receiving all medically necessary care.   His request for gloves was not addressed and he was not provided with any gloves.   Plaintiff Brian Murphy has not received a response to his grievance dated December 9, 2011, requesting a

32

cane and transfer to another cell to accommodate his mobility impairment, even though Defendants' policies and procedures state they "usually" will respond within 14 days.

## CLAIMS FOR RELIEF

### First Cause of Action

### (Eighth Amendment)

113.   By their policies and practices described in paragraphs 28 - 107, Defendants subject Plaintiffs and the Plaintiff class to a substantial risk of harm and injury from inadequate health care and violence.  These policies and practices have and continue to be implemented by Defendants and their agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

114.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Second Cause of Action

### (Fourteenth Amendment)

115.   By their policies and practices described in paragraphs 28 - 107, Defendants subject Plaintiffs and the Plaintiff class to a substantial risk of harm and injury from inadequate health care and violence.  These policies and practices have and continue to be implemented by Defendants and their agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

116.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Third Cause of Action

### (Americans with Disabilities Act)

### 42 U.S.C. Sections 12101 *et seq.*

117.   By their policy and practice of failing to reasonably accommodate prisoners with

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

disabilities as described in paragraphs 108 - 113, Defendants violate the Americans with Disabilities Act, 42 U.S.C. Section 12132 and 28 C.F.R. Section 35.152(b)(1).

118.   Plaintiff Murphy, and the subclass of prisoners with disabilities he represents, are qualified individuals with disabilities as defined in the Americans with Disabilities Act.

119.   Defendants have violated the ADA by failing or refusing to provide plaintiffs with reasonable accommodations and other services related to their disabilities.   *See generally* 28 C.F.R. Section 35.130.   Defendants have violated the ADA by failing to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. Section 35.130(b)(7).

120.   Defendants have violated the ADA by failing to make available information to prisoners about their rights under the ADA while detained in its Jail.  28 C.F.R. Section 35.106.

121.   Defendants have violated the ADA by failing "to designate at least one employee to coordinate its efforts to comply with and carry out is responsibilities under . . . [the ADA], including any investigation of any complaint communicated to it alleging its noncompliance. . . ." 28 C.F.R. Section 35.107(a).

122.   Defendants have violated the ADA by failing to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by . . . [the ADA]." 28 C.F.R. Section 35.107(b).

123.   Defendants have violated the ADA by failing to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in . . . a service, program, or activity of a public entity."   28 C.F.R. Section 35.160(b)(1).

124.   Defendants have violated the ADA by failing to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. Section 35.152(b)(2).

125.   As a result of Defendants' policy and practice of failing to provide reasonable accommodations, Plaintiff Murphy, and the subclass of prisoners with disabilities he represents, do not have equal access to Jail activities, programs, and services for which they are otherwise

34

1    qualified.

2    **Fourth Cause of Action**

3    **(Rehabilitation Act)**

4    **29 U.S.C. Section 794**

5    **126.**    By their policy and practice of failing to reasonably accommodate prisoners with

6    disabilities as described in paragraphs 108 - 113, Defendants violate Section 504 of the

7    Rehabilitation Act, 29 U.S.C. Section 794.

8    **127.**    Plaintiff Murphy, and the subclass of prisoners with disabilities he represents, are

9    qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act.

10    **128.**    At all times relevant to this action, Defendants were recipients of federal funding

11    within the meaning of the Rehabilitation Act. As recipients of federal funds, they are required to

12    reasonably accommodate inmates with disabilities in their facilities, program activities, and

13    services.

14    **129.**    As a result of Defendants' policy and practice of failing to provide reasonable

15    accommodations, Plaintiff Murphy, and the subclass of prisoners with disabilities he represents,

16    do not have equal access to Jail activities, programs, and services for which they are otherwise

17    qualified.

18    **PRAYER FOR RELIEF**

19    **130.**    Plaintiffs and the class they represent have no adequate remedy at law to redress

20    the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to

21    suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the

22    Defendants as alleged herein, unless Plaintiffs are granted the relief they request. The need for

23    relief is critical because the rights at issue are paramount under the Constitution of the United

24    States,

25    **131.**    WHEREFORE, Plaintiffs, on behalf of themselves and the class they represent,

26    request that this Court grant them the following relief:

27    A.    Declare the suit is maintainable as a class action pursuant to Federal Rule of Civil

28    procedure 23(a) and 23(b)(1) and (2);

B.      Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendants and their agents, officials, and employees are in violation of the rights of Plaintiffs and the class they represent under the Eighth and Fourteenth Amendments to the Constitution, the ADA, and Section 504 of the Rehabilitation Act;

C.      Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to provide minimally adequate health care to prisoners, to protect prisoners from a substantial risk of harm, and to provide reasonable accommodations to prisoners with disabilities.

D.      Enjoin Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint, and from failing to provide equal access to programs, services, and activities to prisoners with disabilities, and minimally adequate health care and protection to prisoners from a substantial risk of harm;

E.      Award Plaintiffs, pursuant to 29 U.S.C. Section 794(a), 42 U.S.C. Sections 1988, 12205 and 12133, the costs of this suit and reasonable attorneys' fees and litigation expenses;

F.      Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

G.      Award such other and further relief as the Court deems just and proper.

Dated: January 25, 2012              Respectfully submitted,

PRISON LAW OFFICE

By: /s/ Kelly Knapp

DONALD SPECTER
KELLY KNAPP
Attorneys for Plaintiffs

36
**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1    COOLEY LLP

2    By: */s/ Maureen Alger* _____

3    MAUREEN P. ALGER
4    MARY KATHRYN KELLY
     Attorneys for Plaintiffs
5
     DISABILITY RIGHTS CALIFORNIA
6
7    By: */s/ Rachel Scherer* _____

8    MELINDA BIRD
     RACHEL SCHERER
9    ANDREW BERK
     Attorneys for Plaintiffs
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37
**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**