PRISON LAW OFFICE
DONALD SPECTER (SBN 83925)
KELLY KNAPP (SBN 252013)
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704
dspecter@prisonlaw.com
kknapp@prisonlaw.com
*Attorneys for Plaintiffs and Plaintiff Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **QUENTIN HALL, SHAUN GONZALES, ROBERT MERRYMAN, DAWN SINGH, and BRIAN MURPHY, on behalf of themselves and all others similarly situated,** | 1:11-CV-02047-LJO-BAM |
| Plaintiffs, | **DECLARATION OF KELLY KNAPP IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| v. | Date:        September 28, 2015 |
| **County of Fresno,** | Time:        3:00 p.m |
| Defendant | Courtroom:   8 |
| | Judge:       Hon. Barbara McAullife |
| | Action Filed: December 13, 2011 |

I, Kelly Knapp, hereby declare:

1.   I am an attorney at law admitted to practice before the courts of the state of California.  I am a staff attorney at the Prison Law Office, and counsel for Prisoner Plaintiffs in this litigation.  I make this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement.  If called as a witness, I would and could competently testify to the facts stated herein, all of which are within my personal knowledge.

2.   The Prison Law Office and our co-counsel at Cooley LLP and Disability Rights California have been working for more than four years on this matter, vigorously representing the interests of the class.  We are committed to continue our effective and efficient representation of the interests of the Plaintiff class by closely monitoring implementation of the settlement.

3.   In response to comments filed by class members regarding the settlement agreement, the parties met and conferred regarding changes that may be necessary to Sections I.N.3 and II.G. of the Remedial Plan to ensure that it is fair, reasonable, and complies with state law.  The parties accordingly agreed to revise those sections of the Remedial Plan.  A true and correct copy of the revised Remedial Plan is attached as Exhibit 1.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 21st day of September, 2015 at Berkeley, California.

/s/
_____
Kelly Knapp

1

EX. 1

*Hall, et. al. v. County of Fresno*
# REMEDIAL PLAN
### September 21, 2015

Pursuant to the Consent Decree entered on May 28, 2015, the County of Fresno agrees to implement the following measures.

## I.  MEDICAL CARE

### A.  Organizational Structure and Leadership

1. The County shall ensure that jail health care staff and the Sheriff's Office implement an interagency agreement that addresses mutual responsibilities in the provision of health care.

2. The Jail Medical Director shall be Board Certified or Board eligible in Internal Medicine or Family Practice.

3. Jail health care staff shall meet with Sheriff's Office staff during monthly administrative meetings that shall include an agenda and minutes.

4. Jail health care staff and the Sheriff's Office shall develop and implement standardized procedures that provide coordination between correctional and medical staff such that patients receive safe and timely access to care and medications.

5. The County shall require that jail health care staff are appropriately credentialed according to the licensure, certification, and registration requirements for the State of California.

6. Jail health care staff shall participate in mock fire drills conducted by the Sheriff's Office once a year.

### B.  Staffing

1. The County shall deliver adequate health care to comply with this Remedial Plan.

2. The County shall employ adequate numbers of correctional staff to assist with medication administration and the movement of patients to receive health care services.

3. The County will provide a budget for jail health care services sufficient to finance adequate health care and correctional staff to comply with this Remedial Plan.

**C. Clinic Space**

1. The County will provide an adequate number of clinic examination rooms to deliver adequate health care and comply with this Remedial Plan.

2. Clinic examination rooms shall have standardized equipment and par levels of supplies in a standardized presentation.

**D. Policies and Procedures**

1. The County's policies and procedures regarding medical intake shall require completion of a Medical Intake Screening form that includes the following:

   a. Questions on the history of HIV/AIDS, Tuberculosis, and Kidney Disease; and
   b. Questions regarding legal and illegal drug use (e.g., type, time of last use and quantities.)

2. The County's policies and procedures shall include that inmates with chronic illness are identified and seen after intake based on acuity (on the day of arrival for patients with high acuity and not to exceed 14 days for all others), and for follow-up appointments in intervals that do not exceed 90 days unless such inmates are clinically stable on at least two consecutive encounters, in which case not to exceed intervals of 180 days.

3. The County's policies and procedures regarding Individualized Treatment Plans shall include the following:

   a. The minimum time period between intake screening and the first history and physical examination shall be specified and based on acuity (not to exceed 14 days for all inmates);

   b. Continuity of medications shall occur within 24 hours for inmates with chronic illness, unless there are extenuating circumstances that prevent the prescription of such medications, in which case the inmate shall be evaluated by a physician or mid-level practitioner within 24 hours to determine an alternative treatment plan; and

*Hall, et. al. v. County of Fresno,* Consent Decree, Appendix A, Remedial Plan

    c.  The minimum time period between physician evaluations shall be specified based on acuity.

4.  The County's policies and procedures shall include that prescription medications shall only be prescribed by licensed physicians, physician's assistants, or nurse practitioners, within the scope of their licensures.

5.  The County's policies and procedures regarding detoxification shall include the following:

    a.  Detoxification shall occur only under medical supervision in accordance with local, state, and federal laws;

    b.  Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs shall be conducted under medical supervision when performed at the facility;

    c.  Inmates being detoxified shall be monitored by a physician;

    d.  Specific guidelines shall be followed for the treatment and observation of inmates manifesting mild or moderate symptoms of intoxication or withdrawal from alcohol and other drugs;

    e.  Monitoring shall be structured and documented in accordance with the Clinical Institute Withdrawal Assessment or the Clinical Opiate Withdrawal Scale; and

    f.  Inmates experiencing severe, life threatening intoxication (an overdose) or withdrawal shall be transferred under appropriate security conditions to a facility where specialized care is available.

6.  The Sheriff's Office policies and procedures regarding Safety Cells shall include that inmates may not be housed in safety cells for medical reasons.

7.  The Sheriff's Office policies and procedures regarding disciplinary diets shall include that physicians assess whether a disciplinary diet will affect a prisoner's medical condition.

8.  The County's policies and procedures regarding health records shall include the following:

    a.  All medical records must comply with state and federal regulations pertaining to access, disclosure and/or use of health information; and

    b.  Health record and health information, both oral and documented, is confidential protected health information. The minimum necessary health information is to be disclosed to health care staff providing health care or to

jail authorities when necessary for the protection of the welfare of the inmate or others, management of the jail, or maintenance of jail security and order.

9. The County's policies and procedures shall separately identify the following pharmaceutical procedures:

   a. Procurement of pharmaceuticals;
   b. Controlled substances;
   c. Storage of medication;
   d. Use of methadone;
   e. Ordering and dispensing medication;
   f. Medication administration;
   g. Documentation of medication administration; and
   h. Medication renewal.

10. The County's policies and procedures shall include that all tuberculosis screening and management shall be conducted in accordance with the American Correctional Association (ACA) and the National Commission on Correctional Health Care (NCCHC), "Standards for Health Services", as endorsed under recommendations of the Center for Disease Control (CDC) guidelines.

11. The County's policies and procedures shall include an Infection Prevention Plan that includes procedures for identification, treatment, isolation, surveillance, immunization (when applicable), prevention, education and follow-up related to infectious diseases.

12. The County's policies and procedures shall include Nursing Encounter Protocols /Tools that are appropriate to the level of skill and preparation of the nursing personnel who will carry them out and comply with the relevant state practice acts.

13. The County's policies and procedures shall require that pregnant inmates receive timely and appropriate prenatal care, postpartum care, counseling, and specialized obstetrical services when indicated.

14. The Sheriff's Office policies and procedures shall include a procedure to monitor temperatures in the facilities for the purpose of ensuring that inmates prescribed psychotropic medications are not at risk of malignant hyperthermia from extremely hot conditions, after consultation with medical/mental health staff, and that inmates are provided with extra blankets as needed in extremely cold conditions.

15. The County's policies and procedures regarding restraints shall include the following:

    a. Restraints shall not be used for medical purposes or during any medical procedures;

    b. Medical staff shall not participate in decisions to initiate use of restraints by correctional staff;

    c. Medical staff shall take all necessary measures to maintain proper peripheral circulation during the use of restraints; and

    d. A registered nurse or LVN under the supervision of a RN shall document vital signs, mental status, and sensation of limbs within the first hour of placement, and by medical staff at least every 60 minutes thereafter.

16. The County's policies and procedures shall be revised, as necessary, to reflect all of the health care remedial measures described in the Remedial Plan, and the County shall deliver healthcare pursuant to these revised policies and procedures.

## E. Medical Intake and Screening

1. Tuberculosis screening shall include the following:

    a. Screenings provided in accord with Centers for Disease Control and Prevention guidelines;

    b. Inmates shall receive either Mantoux skin testing or Interferon-gamma release assays (IGRAs) within five days of intake;

    c. Inmates who present with an initial positive tuberculosis screening result shall receive a chest radiograph.

2. All inmates shall receive a thorough nursing intake screening to include vital signs, capillary blood glucose testing for persons with diabetes, peak expiratory flow rate for persons with asthma, and oxygen saturation for persons with emphysema.

## F. Access to Care

1. Correctional officers shall make blank health service request forms available to inmates, and only health care staff shall collect completed health service request forms. Locked boxes shall be available in dorm and open-cell housing units for inmates to submit health service request forms. Health care staff shall pick up completed health service request forms directly from inmates in lockdown units during medication passes twice a day.

2. The following procedures regarding completed health service request forms and nursing triages shall be followed:

    a. Health care staff shall collect and triage completed health service request forms at least twice a day to determine the urgency based on the complaint;

    b. All inmates with emergent issues shall be seen immediately, urgent issues within 24 hours, and routine requests shall be scheduled within 72 hours;

    c. All inmates experiencing symptoms shall have vital signs taken during their face-to-face evaluations; and

    d. Nurses shall review the charts of the inmates being evaluated during all triages.

3. All nursing sick call encounters shall occur in a room with an examination table, sink, proper lighting, proper equipment, and with a medical record.

4. When a nurse determines clinician follow-up is necessary for diagnosis and treatment of an inmate's condition, the inmate shall be referred to a physician, physician's assistant, or nurse practitioner for a face-to-face evaluation that takes place immediately for emergent concerns, within 24 hours for urgent concerns, and within 14 days for non-emergent or non-urgent concerns.

## G. Outpatient Housing Unit (OHU)

1. The following procedures for inmates housed in the OHU for medical treatment shall be followed:

    a. Physicians, Nurse Practitioners, or Physician's Assistants shall sign an admittance order for patients housed in the OHU; to be followed by a complete history and exam within 72 hours;

    b. Inmates admitted to the OHU shall receive daily checks to include review of symptoms and vital signs by RNs; to be documented in the inmate's medical record;

    c. Physicians shall examine patients housed in the OHU no less frequently than every 14 days; and

    d. Correctional officers shall notify medical staff immediately when an inmate in the OHU is requesting medical assistance.

2. The OHU shall be made compliant with Americans for Disabilities Act regulations.

**H. Chronic Care**

1. Health care services shall include a chronic disease management program.

2. The chronic disease management program shall conform to contemporary standards of care such as the National Health Lung and Blood Institute and asthma, hypertension, and lipid guidelines and American Diabetes Association guidelines.

3. All inmates with chronic illness shall be tracked on a chronic illness roster.

4. The chronic disease management program shall measure the number of inmates with chronic illness who receive their medication within a day of incarceration.

**I. Specialty Care**

1. Specialty care appointments shall be tracked in a log that identifies the referral date, the date the referral was sent to the clinic, the date the appointment is confirmed, and, if the appointment is rescheduled or canceled, the reason it was rescheduled or canceled.

2. Inmates whose specialty appointment exceeds three months should be examined by a physician, physician's assistant, or nurse practitioner monthly and evaluated to determine if urgent evaluation is indicated.

3. Specialty consultant arrangements for pulmonology and ophthalmology shall be developed.

**J. Pharmacy and Medication Administration**

1. Nursing staff shall observe patients taking medications, especially when Direct Observation Therapy is required by the physician's order.

2. Nursing staff shall deliver medications with the lights on in administrative segregation areas and observe patients ingest their medications.

3. Medication administration shall be documented immediately after administration, with the exception of inmates housed on the second tier of the administrative segregation areas. For those inmates housed on the second tier in the lockdown areas, the nurses shall follow the following procedure:

     a. Prior to the start of each pill pass, while in the pharmacy, the nurse will put the medications inside pill envelopes labeled with the patient's name and Jail Identification Number;

     b. Nurses will push the medication carts into the pods;

     c. After entering the pod, the nurse will carry the envelopes in his/her hands or pockets and will go cell door to cell door to administer the medications; and

     d. Once the entire pill pass is completed, the nurse will return to the medication cart and push the cart outside the housing unit to complete charting.

4. All hygiene practices while dispensing and administering medications shall conform to nationally accepted professional standards.

5. All methadone treatment services for inmates shall conform with state and federal regulations.

6. Access to pharmacy keys shall be limited only to health care staff assigned to work in the pharmacy and the Director of Nursing. The pharmacy door shall remain closed and locked when pharmacy staff is not present. All medication cabinets shall remain locked at all times. Nursing Supervisors and Director of Nursing shall monitor control of the pharmacy daily by direct observation.

## K. Dental Care

1. The County shall employ sufficient numbers of dental staff to provide timely access to adequate dental care.

2. A qualified or appropriately trained clinician shall triage dental care requests to identify emergent or urgent issues that require treatment of pain or infection.

## L. Medical Records

1. The County, through Corizon, shall implement an electronic health record for inmates within the first year of Corizon's contract.

2. All paper medical records shall be controlled via a sign-out procedure, and paper files shall be centrally located to increase accountability.

3. Medical records paperwork shall be filed in a timely manner.

4. Correctional staff shall not have access to the completed intake screening form.

**M. Self-Monitoring, Quality Improvement, and Reviews**

1. The County shall train all nurses on appropriate nursing protocols during new employee orientation, and Nurse Supervisors shall review nursing competencies annually.

2. Any unorthodox treatment provided by physicians shall be subject to peer review.

3. Physicians shall be evaluated annually by peer review, and nurses shall be evaluated annually by their supervisors.

4. A Medical/Behavioral Quality Improvement Committee that includes the Medical Director, psychiatrist, registered nurse, pharmacy representative, Department of Public Health representative, and correctional representative shall meet quarterly for the purpose of peer review and systematically analyzing and improving processes and the quality of medical care.

5. Each quarter, the Quality Improvement Committee shall monitor several of the following key processes of care:

   a. Numbers of inmates who missed intake screening;
   b. Numbers of inmates who missed TB screening at intake;
   c. Numbers of inmate health requests submitted daily, numbers triaged within 24 hours, and the numbers who received face-to-face evaluations within 72 hours;
   d. The percent of inmates who received their first dose of medication within 24 hours of prescription;
   e. The number of medical records that could not be located upon request;
   f. The length of time to specialty appointment by service;
   g. The number of inmates with chronic illnesses who received their medications within a day of incarceration; and
   h. The number of inmates with chronic illnesses who received a history and physical examination by a provider within two weeks of incarceration.

6. The Medical Director shall ensure that any corrective action recommended by the Medical/Behavioral Health Quality Improvement Committee is implemented and completed within 30 days of the report making such recommendations, unless there are extenuating circumstances preventing implementation and completion within such timeframe in which case it shall occur as soon as reasonably practical.

**N.  Mortality Reviews**

1.  Mortality reviews shall include a written report.

2.  Mortality reviews shall include identification of problems for which corrective action is undertaken.

3.  Autopsies shall be performed for all deaths, except for where the cause of death can be conclusively determined from the facts known before the death.

## II.  MENTAL HEALTH CARE

**A.  Staffing**

1.  Clinical decisions, diagnoses, and treatment plans shall only be made by licensed mental health clinicians (psychiatrists, psychologists, therapists, clinical social workers, psychiatric nurses).  Licensed mental health clinicians shall review and cosign record entries made by Licensed Psychiatric Technicians (LPTs) and Licensed Vocational Nurses (LVNs) when the LVNs and LPTs are providing behavioral health services.

2.  The County shall employ the number of mental health care providers necessary to provide adequate mental health care and supervision.

3.  The total psychiatrist time provided shall be a minimum of 50 to 55 hours per week.

4.  In the event group sessions are conducted by unlicensed mental health staff, the group shall be strictly educational, and staff shall provide participants with a handout specifying that no discussion of personal issues may occur.

**B.  Continuity of Care**

1.  The County shall provide continuity of care from admission to transfer or discharge from the facility, including referral to community-based providers, when indicated. Jail health care staff shall provide discharge planning for sentenced inmates with serious mental health disorders, including connecting such inmates to community health care providers, community social services, community-based housing, and/or appropriate services per the individual's need.  The same services will be provided to unsentenced inmates provided adequate time is available prior to a legally mandated release.

2. The County shall develop and implement a system that allows patients who are prescribed psychiatric medications to have access to these medications as soon as possible following their release from jail.

3. The Department of Behavioral Health (DBH) shall collaborate with mental health staff to provide continuity of care with psychiatric medications and referrals to DBH services, and mental health staff shall have access to the DBH computerized information database to facilitate such care.

4. The County shall coordinate transportation, as necessary, with outside agencies and applicable community resources for inmates with serious mental illness who are released from custody.

## C. Psychiatry Services

1. Psychiatric medications, including but not limited to antipsychotic medications, shall be prescribed to inmates with mental illness in accord with nationally accepted professional standards for the treatment of serious mental illness.

2. Physicians shall "bridge" all verified, valid prescriptions for inmates who enter the facility currently on psychiatric medications.  Inmates who receive such bridge medications shall receive a face-to-face evaluation with a psychiatrist within seven days of initiation of the medication.  Follow-up face-to-face evaluations shall occur as needed, but within 30 days following the initial visit.  Subsequent face-to-face evaluations by the psychiatrist shall occur as needed, but at intervals of no more than 90 days.

3. Inmates who are prescribed psychiatric medications by the psychiatrist (i.e., not "bridge" medications) shall receive follow-up face-to-face evaluations with a psychiatrist as needed depending on their clinical status, but no later than 30 days following the initial visit.  Subsequent visits shall occur as needed but at intervals of no more than 90 days.

## D. Intake

1. The Health Care Screening Form shall include a question regarding any history of mental health problems or treatment, hospitalizations, and/or current or previous thoughts of self-harm.

### E. Suicide Prevention

1. Mental health clinicians shall complete a comprehensive suicide risk assessment form for all inmates who display signs of suicide risk to determine if the inmate presents a low, moderate, or high risk of suicide.  Mental health clinicians shall complete a new form if there are indications of any modification of risk factors, including but not limited to any suicide attempts or expressions of suicidal ideation.

2. Inmates displaying signs of suicide risk shall be referred to a mental health clinician for an evaluation.

3. The Sheriff's Office and health care staff shall develop and implement policies and procedures for housing and monitoring inmates that present a low or moderate risk of suicide.  Low-risk inmates shall be monitored at least monthly by mental health staff and shall be housed with other inmates or, if they cannot be housed with other inmates, in housing where they can be frequently monitored by correctional staff. Moderate-risk inmates shall be monitored at least weekly by mental health staff and shall be housed with other inmates unless they pose a safety and security threat to other inmates.  Moderate-risk inmates shall also be housed in locations that allow custody staff to observe and communicate with these inmates on a daily basis.

4. Sentenced inmates who have been identified as a moderate or high level of suicide risk on their most recent comprehensive suicide risk assessment form shall receive an evaluation by a mental health clinician prior to their release to the community for appropriate referrals or initiation of an involuntary psychiatric hold pursuant to Welfare and Institutions Code Section 5150.  The same services will be provided to unsentenced inmates provided adequate time is available prior to a legally mandated release.

5. All health care staff shall receive training regarding suicide prevention during new employee orientation, and updated training annually.  Correctional officers shall receive suicide awareness and prevention training annually.  All such training shall be provided by a licensed clinician having expertise in correctional suicide prevention and the use of a suicide risk assessment form.

### F. Behavior Management

1. The Sheriff's Office shall assist jail mental health staff in the development and implementation of behavior management plans for inmates with serious mental illness who engage in repeated acts of misconduct with the goal of reducing their placements, or shortening the length of time they spend, in lockdown administrative segregation housing.

2. Correctional staff assigned to Population Management who are familiar with the housing of inmates with serious mental illness shall be included in administrative meetings where behavior management plans are developed and reviewed.

## G. Administrative Segregation

1. The Sheriff's Office shall adopt and implement a policy of leaving open all of the cell door portal coverings in 2D of the South Annex Jail from 7:00 a.m. to 10:00 p.m. unless an inmate requests that it remain closed or it is necessary to temporarily close the portal for exigent circumstances related to jail security.

2. The Sheriff's Office and jail mental health staff shall collaborate to adopt and implement a policy of housing no inmates with serious mental illness in 2D of the South Annex Jail or the A Pods, FF Units, and any locked down Administrative Segregation or Disciplinary Housing Unit in the Jail system unless those inmates demonstrate a current threat to jail security, inmate and/or officer safety, as documented by correctional staff, that prevents them from being safely housed in less restrictive locations.

3. In the event any inmates with serious mental illness (SMI) must be housed in 2D, correctional and mental health staff shall ensure those inmates are offered to be taken out of their cells for recreation a minimum of 7 hours per week and mental health treatment shall be offered 3 times per week.

   a. Inmates with SMI who are placed in isolation in 2D cells for more than 48 hours are to have their cases reviewed by a multidisciplinary team consisting of corrections and mental health staff every two weeks. Decisions for an individual's continued housing in isolation includes input from a licensed mental health clinician.
   b. Out-of-cell structured behavioral health services for individuals with SMI held in isolation in 2D cells will be offered:
      i. A minimum of three out-of-cell mental health contacts per week consisting of structured individual or group therapeutic/educational treatment and programming, each lasting approximately one hour with appropriate duration to be determined by a mental health clinician.
      ii. At a minimum, one one-to-one structured therapeutic contact session will be offered by a mental health clinician.  The remaining two contacts per week may either be additional one-to-one structured therapeutic contacts or group therapeutic/educational contact sessions.
   c. Mental health contacts are to be documented indicating type and duration of activity.

4. In the event any inmates with serious mental illness must be housed in FF Units or any locked down Administrative Segregation or Disciplinary housing unit in the Jail system, correctional and mental health staff shall ensure those inmates are offered to be taken out of their cells for recreation a minimum of 7 hours per week and mental health treatment shall be offered 3 times per week.

   a. Inmates with SMI who are placed in isolation in FF cells or any locked down Administrative Segregation or Disciplinary housing unit in the Jail system for more than 48 hours are to have their cases reviewed by a multidisciplinary team consisting of corrections and mental health staff every two weeks.  Decisions for an individual's continued housing in isolation includes input from a licensed mental health clinician.

   b. Out-of-cell structured behavioral health services for individuals with SMI held in isolation in FF cells or any locked down Administrative Segregation or Disciplinary housing unit in the Jail system will be offered:

      i. A minimum of three out-of-cell mental health contacts per week consisting of structured individual or group therapeutic/educational treatment and programming, each lasting approximately one hour with appropriate duration to be determined by a mental health clinician.

      ii. At a minimum, one one-to-one structured therapeutic contact session will be offered by a mental health clinician.  The remaining two contacts per week may either be additional one-to-one structured therapeutic contacts or group therapeutic/educational contact sessions.

   c. Mental health contacts are to be documented indicating type and duration of activity.

5. Medical staff shall complete health checks on all inmates in 2D of the South Annex Jail and the A Pods, FF Units, and in any locked down Administrative Segregation or Disciplinary housing unit in the Jail system at least three times a week and document the checks to include any verbal exchange allowing inmates to report any health or mental health needs or concerns.

6. The Sheriff's Office shall adopt and implement a policy of reviewing the status of inmates with serious mental illness housed in A Pods in the Main Jail at least once every 30 days to determine if the inmate can be moved to less restrictive housing. Jail mental health staff shall assess SMI inmates' housing requirements, which shall be discussed at monthly administrative meetings with custody and health care staff. This provision is not intended to and does not require a new mental health assessment of all inmates with serious mental illness every 30 days so long as jail mental health staff have adequate information to make an informed and meaningful

recommendation about whether SMI inmates should continue to be housed in that unit.

**H. Quality Improvement**

1. The quality improvement committee that meets quarterly shall collect and manage data to develop corrective action plans in response to mental health program weaknesses that are identified.  Areas that require recurrent review include, but are not limited to, the following:

   - Timely continuity of verified community prescriptions for psychiatric medications;
   - Continuity of care for inmates with serious mental illness leaving custody;
   - Timely triage of health care service request forms describing mental health symptoms; and
   - Health checks of inmates in 2D of the South Annex Jail and the A Pods and FF cells in the Main Jail.

**III. ACCOMMODATIONS FOR INMATES WITH DISABILITIES**

**A.  Housing**

1. The Sheriff's Office shall house inmates with disabilities in facilities that accommodate their disabilities no later than 24 months from issuance of the consent decree.  In the interim, the Sheriff's Office shall house inmates with disabilities in the most integrated and appropriate housing possible, based on their disabilities.

2. The County shall provide accessible toilets and showers in units where inmates requiring special accommodations for access are housed no later than 24 months from issuance of the consent decree.  Accessible toilets and showers shall have such physical features as grab bars, shower seats, no shower curbs, no stairs, and pathways wide enough to permit wheelchair/walker access, etc.  In the interim, the Sheriff's Office shall house inmates with disabilities in the most integrated and appropriate housing possible, based on their disabilities.

3. The Sheriff's Office and medical staff shall communicate to determine appropriate housing for inmates with disabilities.  Medical staff shall make available all information needed to make adequate housing decisions.

4. The Sheriff's Office shall create and implement the use of a centralized list of housing placements with accessible features to simplify housing decisions and

identify gaps in placement options.  This list shall separately identify each cell in the Outpatient Housing Unit, since these vary in their accessible features.

5. The Sheriff's Office and medical staff shall collaborate to implement the use of a system that reflects an assessment of an inmate's functional limitations and restrictions, including but not limited to:
   a. The need for an accessible shower and toilet;
   b. The need for ground floor housing;
   c. The need for no stairs in the path of travel;
   d. The need for level terrain; and
   e. The need for and description of assistive devices and the conditions in which they are to be used (e.g., use of a wheelchair full time, for all distances greater than 50 feet, whenever out of cell/bed area, etc.).

6. The following information shall be included in Offendertrak:
   a. The need for an accessible shower or toilet;
   b. The need for a lower bunk;
   c. The need for assistive devices;
   d. The need for ground floor housing;
   e. The need for level terrain;
   f. The need for no stairs in the path of travel.

7. The Sheriff's Office shall not place inmates with disabilities in the OHU unless they are receiving medical care or treatment, or there is no other housing location where they can be reasonably accommodated.  Inmates with disabilities who are housed in the OHU because they cannot be reasonably accommodated in other locations shall receive equal access to services, programs, and activities.

## B. Assistive Devices

1. The Sheriff's Office and jail health care staff shall collaborate to develop standardized procedures for the prescription, ordering, retention, and confiscation of assistive devices.  Policies shall be developed in a manner that is protective of the safety and security of inmates and staff while affording equal access to jail programs, services, and activities for inmates with disabilities.
2. An inmate who arrives at the jail with an assistive device shall be allowed to retain the device, or shall be provided with a jail-issued equivalent device, so long as it does not constitute an immediate risk of bodily harm or threaten the security of the facility,

unless a jail physician documents that the device is not medically necessary or reasonable to allow equal access to jail programs, services, or activities.

3. The Sheriff's Office shall provide assistive devices prescribed by a jail physician to inmates as soon as reasonably practical, so long as the device does not constitute an immediate risk of bodily harm to inmates or staff, or threatens the security of the facility.

4. The Watch Commander shall be responsible for determining if an assistive device constitutes an immediate risk of bodily harm or threatens the security of the facility. If the Watch Commander makes such a determination, correctional staff shall consult with medical staff to determine an appropriate alternative accommodation that shall be provided. Assistive devices shall not be confiscated if another inmate is the source of the security threat.

## C. Training and Management

1. American with Disabilities Act (ADA) training shall be provided to all new health care staff and correctional staff, and to all other existing staff as needed on an ongoing basis.
2. The Sheriff's Office ADA Coordinator shall confer with medical staff monthly to review whether accommodations for inmates with disabilities continue to be appropriate and necessary.

## D. Grievances

1. The Sheriff's Office shall provide an inmate grievance system that inmates with disabilities may use to contest any disability-based discrimination or violations of the ADA, and will provide a prompt and equitable resolution to each issue raised.

2. The Sheriff's Office shall train all correctional staff assigned to screen or review grievances to identify requests for reasonable accommodations and allegations of disability-based discrimination or violations of the ADA.

3. The Sheriff's Office ADA coordinator shall review all ADA related complaints, assign an ADA trained officer to investigate the complaints and provide substantive responses.

## E. Notice and Effective Communication

1. The inmate handbook shall be revised at the next printing (2016) to include additional information regarding the "Americans with Disabilities Act," "Disabilities," and how to request "Reasonable Accommodations." The contact information of the jail's

designated ADA coordinator and the disability complaint procedures shall be made available in the inmate handbook. Inmates shall be provided jail inmate handbooks during the intake booking process.  Until the handbook can be updated and printed, an addendum shall be provided inside each handbook distributed.

2. The Sheriff's Office shall post and disseminate ADA notices in alternative formats to promote effective communication, and make available grievance forms to address ADA related complaints.

3. The Sheriff's Office shall develop and implement policies such that inmates with communication deficits are provided with reasonable accommodations (e.g., reading and writing assistance).  This shall include both communications to the inmates (Jail rules, policies, notices, etc.) and addressing needs for the inmate to communicate with jail staff.

## IV. JAIL SAFETY AND SECURITY

### A. Staffing

1. The County shall employ adequate numbers of qualified correctional officers to comply with this Remedial Plan as outlined in the Staffing Plan with the hiring of 127 Correctional Officers over a three year period, or as soon thereafter as the labor pool permits.

2. The Sheriff's Office shall implement a staffing plan designed to reduce inmate-on-inmate violence in the jails.  This plan includes the hiring of 127 new correctional officers spread over three years, or as soon thereafter as the labor pool permits.  These 127 Correctional Officer positions shall be formally added to the County's Salary Resolution upon Court approval of the Consent Decree.

3. Correctional staff shall conduct appropriate rounds with sufficient frequency to provide inmates with adequate supervision and reasonable safety.  More frequent rounds shall be conducted for inmates requiring more intensive supervision for safety and security reasons.

### B. South Annex Jail

1. The South Annex Jail is an antiquated facility, and shall be considered for being taken off-line as soon as practicable.

2. While the South Annex Jail remains in use, there shall be assigned adequate numbers of correctional officers to protect inmates from an unreasonable risk of harm from violence and injury from other inmates and physical plant deficiencies.

## C.  Use of Force and Quality Assurance

1. The Sheriff's Office shall reintroduce de-escalation tactics and techniques into the annual training plan to reinforce the importance of communication skills in relationship to a correctional facility environment.  This training shall be introduced to staff in fiscal year 2014/2015.

2. The Sheriff's Office shall document all incidents (including those that are serious) involving inmates that include suicides, suicide attempts, inmate-on-inmate violence, use of force by staff, fires, escapes and deaths.

3. All documented incidents of the use of force shall be reviewed by the Jail Sergeant and Watch Commander within 24 hours of the report being submitted, and by facility commanders on a monthly basis.

4. All pre-planned uses of force shall be video recorded.

5. Jail Command Staff shall conduct quality assurance reviews on a monthly basis of all documented incidents involving suicides, suicide attempts, inmate on inmate violence, use of force by staff, sexual assaults, fires, escapes, and deaths, and information developed during those reviews shall be incorporated into improving policies, procedures, and practices to remedy any deficiencies identified.

6. Quality Assurance criteria, policies and procedures shall be developed to guide the protocols of the Jail Command staff's monthly meetings and review, to include assaults, fights, deaths, fires, use of force, escapes, sexual assaults, physical plant safety concerns, control of flammables/caustics, emergency preparedness, emergency key testing, facility sanitation compliance and contract oversight.  This group shall also examine systems of control, Jail policies and procedures, incident trends, and make appropriate recommendations for corrective action to the Jail Administrator.

7. Uses of force incidents shall be reviewed by the Jail Sergeant and Watch Commander as provided herein.  Violations of use-of-force policies shall be properly addressed via the chain of command and necessary Supervisor Incident Reports.  Remedial training shall be directed by supervisory/management staff if it is determined to be

necessary and/or appropriate.  As appropriate, incidents shall be directed to Sheriff's Internal Affairs for possible policy violations, or to the District Attorney's Office if investigation determines such referral is appropriate.

8. The Jail Command Staff (Captains and Lieutenants) shall evaluate the appropriateness of all uses of force as a part of their scheduled agenda during their monthly meetings.  A Jail Sergeant shall be assigned the collateral duty as Use of Force Review Coordinator and be responsible to produce the reports, data and necessary videos for review at these meetings.   The findings of this group shall be forwarded up the chain of command to the Sheriff, with any use of force suspected to be outside of law and/or policy directed to Internal Affairs for additional investigation, as necessary.

### D.  Classification

1. The Sheriff's Office shall maintain an appropriate classification system to protect inmates from unreasonable risk of harm.  Inmates shall be timely classified and placed in housing appropriate for security and safety.  The system shall include consideration of an inmate's security level, suicide risk, and past behavior.

### E.   Inmates with Mental Illness

1. The Sheriff's Office shall gather statistical and comparative data on the uses of force involving inmates with serious mental illness.

2. The County shall conduct initial and periodic training for all correctional staff on how to recognize symptoms of mental illness and respond appropriately.  Such training shall be conducted by a registered nurse and shall include instruction on how to recognize and respond to mental health emergencies.

### F.  Restraint Chairs

1. Inmates shall not be placed in restraint chairs unless there is sufficient justification for such placement that is documented in an incident report.

2. Correctional staff shall review whether the inmate can be removed from the restraint chair no later than two hours after the time of initial placement in the chair.

3. Inmates shall not be held in restraint chairs for longer than four hours.

4. Correctional staff shall notify the on-duty charge nurse of the use of a restraint chair at the time of initial placement.

5. Correctional staff shall provide proper nutrition, hydration, and toileting as safely as possible during the duration of restraint chair placements.

6. Correctional staff shall observe inmates placed in restraint chairs at least two times each successive half hour after the time of initial placement.

## G. Physical Plant

1. The County shall maintain the physical plant of the facility, with special emphasis on security door maintenance. All security doors and locks shall be in proper working order in a manner that maintains appropriate security and safety for jail staff and inmates.

2. The Sheriff's Office shall maintain in working order all cameras, alarms and other monitoring equipment at the jail.

## H. Fire, Emergency, and Tool Safety

1. The County's Internal Services Department Facility Services Division shall maintain the jail in a manner that provides adequate fire safety. The Sheriff's Office shall take all reasonable measures to provide that: (a) inmates can be evacuated in a safe and timely manner during an emergency; (b) emergency exit routes are free of obstacles, maintained in a safe manner, and available for use; (c) emergency keys are readily available to staff; and (d) fire exit plans are posted and clearly labeled.

2. The Sheriff's Office shall develop and implement a written comprehensive fire and safety emergency/disaster plan and appropriately train staff in implementing the plan. Mock fire drills shall also be conducted to make staff familiar with safety procedures and evacuation methods.

3. All emergency keys shall be appropriately marked and identified, consistently stored in a quickly accessible location, tested annually, and staff shall be adequately trained in the use of these keys.

4. All correctional staff shall receive basic Fire and Life Safety training during their first year of training in the Basic Correctional Officer Core Course Academy. The Sheriff's Training Unit shall conduct supplemental Fire Suppression and Evacuation Procedure training during the 2014/2015 fiscal year training cycle. Additional Fire and Life Safety/evacuation procedures shall be conducted on each shift, by shift supervisors on an as-needed basis.

*Hall, et. al. v. County of Fresno,* Consent Decree, Appendix A, Remedial Plan

5. The County's Internal Services Department Facility Services Division shall develop and implement written policies and procedures for the introduction and control of tools in all Jail facilities subject to review and approval by the Sheriff's Office.

**I. Policies and Procedures**

1. The Sheriff's Office shall develop and implement new policies, procedures and post orders as needed to comply with the provisions of this Remedial Plan, including but not limited to the implementation of proper policies, procedures, post orders and corrective action plans to address problems uncovered during the course of quality assurance review activities.

2. Upon Court approval of the Consent Decree, appropriate training shall be formulated and conducted with all staff regarding the requirements of the Consent Decree and Remedial Plan, as well as changes to policies, procedures and/or post orders.

3. The Sheriff's Office will review and update all facility policies and post orders as appropriate to reasonably provide adequate safety and security in the jails.